**No. 26-7277**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

PEDRO VASQUEZ PERDOMO, et al.,

Plaintiffs-Appellees,

v.

RODNEY S. SCOTT, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Central District of California
No. 2:25-cv-5605-MEMF-SP

# EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY PENDING APPEAL, STAY OF PROCEEDINGS, AND IMMEDIATE ADMINISTRATIVE STAY RELIEF REQUESTED BY NOVEMBER 6, 2026


BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney General*

AUGUST FLENTJE
JONATHAN ROBBINS
*Office of Immigration Litigation*

*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6054*

# CIRCUIT RULE 27-3 CERTIFICATE

Undersigned counsel certifies that the following is the information required by Circuit Rule 27-3:

**(1) Telephone numbers and addresses of attorneys for the parties**

Counsel for Defendants-Appellants:

Brett A. Shumate (brett.a.shumate@usdoj.gov)
Drew C. Ensign (drew.c.ensign@usdoj.gov)
Daniel F. Mummolo (daniel.f.mummolo@usdoj.gov)
August Flentje (august.flentje@usdoj.gov)
Jonathan Robbins (jonathan.a.robbins@usdoj.gov)
United States Department of Justice, Civil Division
950 Pennsylvania Avenue NW
Washington, DC 20530

Counsel for Plaintiffs-Appellees:

Adam Benjamin Weiss (adam.weiss@mto.com)
Angela Adriana Uribe (angela.uribe@mto.com)
Clareanna Roberta Goschke (clareanne.goschke@mto.com)
David H Fry (david.fry@mto.com)
Henry David Sheffler (henry.sheffler@mto.com)
Jacob S. Kreilkamp (jacob.kreilkamp@mto.com)
Jamie Bryne Luma (jamie.luma@mto.com)
Kyle Anthony Groves (kyle.groves@mto.com)
Lauren Raquel Perry Stone (laura.perrystone@mto.com)
Lauren Elisabeth Kuhn (lauren.kuhn@mto.com)
Maggie Jane Busgell (maggie.bushell@mto.com)
Sahil Amir Alim (sahil.alim@mto.com)
Sarah H. Worth (sara.worth@mto.com
MUNGER, TOLLES AND OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90005 90071
Telephone: (213) 683-9100

Stacy Tolchin
stacy@tolchinimmigration.com
Law Offices of Stacy Tolchin
776 E. Green St., Suite 210
Pasadena, CA 91101
Telephone: (213) 622-7450
Facsimile: (213) 622-7233

Mohammad Tajsar (mtajsar@aclusocal.org)
Mayra Joachin (mjoachin@aclusocal.org)
Eva Bitran (ebitran@aclusocal.org)
Dae Keun Kwon (akwon@aclusocal.org)
Oliver Ma (oma@aclusocal.org)
Stephanie Padilla (spadilla@aclusocal.org)
Diana Sanchez (dianasanchez@aclusocal.org)
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, CA 90017-4022
Telephone: (213) 977-5232
Facsimile: (213) 201-7878
*Counsel for Stop/Arrest Plaintiffs*

Mark Rosenbaum (mrosenbaum@publiccounsel.org)
Rebecca Brown (rbrown@publiccounsel.org)
Sophia Wrench (swrench@publiccounsel.org)
Ritu Mahajan (rmahajan@publiccounsel.org)
Gina Amato (gamato@publiccounsel.org)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
*Counsel for All Plaintiffs*

Counsel for Intervenors:

Hydee Feldstein Soto (hydee.feldsteinsoto@lacity.org)
Valerie Flores (valerie.flores@lacity.org)
Michael J. Dundas (mike.dundas@lacity.org)
Maria Louise Cousineau (maria.cousineau@lacity.org)
Randal G. Sommer (randall.sommer@lacity.org)

Shubhra Shivpuri (shubhra.shivpuri@lacity.org)
OFFICE OF THE LOS ANGELES
CITY ATTORNEY
City Hall 200 North Spring Street
21st Floor
Los Angeles, CA 90012-4130
Tel.: 213-922-8382; Fax: 213-978-7957
*Counsel for Intervenor City of Los Angeles*

Nicole Davis Tinkham (ntinkham@counsel.lacounty.gov)
Liliana Campos (lcampos@counsel.lacounty.gov)
Brigit Greeson Alvarez (bgreesonalvarez@counsel.lacounty.gov)
OFFICE OF THE COUNTY COUNSEL
648 Kenneth Hahn Hall of Admin.,
500 West Temple Street
Los Angeles, California 90012-2713
Tel.: 213-808-8736; Fax: 213-633-1915
*Counsel for Intervenor County of Los Angeles*

Michele Beal Bagneris (mbagneris@cityofpasadena.net)
Arnold F. Lee (aflee@cityofpasadena.net)
Andrew Aaronian (aaaronian@cityofpasadena.net)
OFFICE OF THE CITY ATTORNEY OF PASADENA
100 N Garfield Ave, Rm N-210
Pasadena, CA 91101
Tel.: 626-744-4141; Fax: 626-744-4190
*Counsel for Intervenor City of Pasadena*

E. Martin Estrada (martin.estrada@mto.com)
Daniel B. Levin (daniel.levin@mto.com)
John L. Schwab (john.schwab@mto.com)
V. Grace Davis (grace.davisfisher@mto.com)
V. Roman Leal (roman.leal@mto.com)
Wendy Qiuyu Xiao (wendy.xiao@mto.com)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, California 90071
Tel.: 213-683-9100; Fax: 213-687-3702
*Counsel for Intervenors Cities of Los Angeles, Anaheim, Bell Gardens, Beverly*

*Hills, Carpinteria, Culver City, Huntington Park, Long Beach, Lynwood, Montebello, Monterey Park, Oxnard, Paramount, Pico Rivera, Pomona, Santa Ana, Santa Barbara, Santa Monica, South Gate, and West Hollywood*

Norman L. Eisen (norman@democracydefenders.org)
Stephen A. Jonas (steve@democracydefenders.org)
Joshua G. Kolb (joshua@democracydefenders.org)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
*Counsel for Intervenor City of Los Angeles*

**(2) Facts showing the existence and nature of emergency**

As set forth more fully in the motion, the district court has entered a sweeping, district-wide injunction placing coercive restraints on lawful immigration enforcement affecting every immigration stop and detention. And, as explained below, the injunction with respect to Fourth Amendment stops is inflicting irreparable harm by preventing the Executive from ensuring that immigration laws are enforced, severely infringing the President's Article II authority. These harms will be compounded the longer that injunction is in place.

**(3) When and how counsel notified**

Defendants' counsel notified counsel for Plaintiffs and Intervenors by email on November 3, 2026, of Defendants' intention to file this motion. The intention to file this motion was also reflected in Defendants' request for a stay pending appeal and stay of proceedings filed in the district court. Dkt. 821.

On November 3, 2026, counsel for Plaintiffs responded that they oppose Defendants' motion and plan to file a response in opposition setting forth Plaintiffs' position on the administrative stay request.

Counsel for Intervenors also responded on November 3, 2026, that they oppose the government's motion and plan to file a response in opposition to the government's requests.

Service will be effectuated electronically through the ACMS system.

**(4) Submissions to the district court**

Defendants have requested a stay pending appeal and stay of proceedings in the district court, as well as a fourteen-day administrative stay in Defendants' opposition to Plaintiffs' motion for preliminary injunction and at the September 24, 2026 hearing. The district court denied those requests. Dkt. 823 at 81-83; Dkt. 840.

**(5) Decision requested by November 6, 2026**

A decision on the motion for a stay pending appeal and stay of proceedings is requested as soon as possible, with an administrative stay in the interim, ideally by November 6, 2026.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

DANIEL F. MUMMOLO
*Counsel to the Assistant*
*Attorney General*

AUGUST FLENTJE
JONATHAN ROBBINS
*Office of Immigration Litigation*

*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6054*

*Counsel for Defendants-Appellants*

## TABLE OF CONTENTS

INTRODUCTION .......... 1

STATEMENT .......... 4

ARGUMENT .......... 7

I. THIS COURT SHOULD GRANT A STAY PENDING APPEAL .......... 8

A. The Government Is Likely To Prevail On The Merits .......... 8

B. The Remaining Stay Factors Tip Decisively In The Government's Favor .......... 19

II. THIS COURT SHOULD GRANT A STAY OF PROCEEDINGS .......... 21

III. AN IMMEDIATE ADMINISTRATIVE STAY IS WARRANTED .......... 22

CONCLUSION .......... 23

## INTRODUCTION

This case has traveled a long way from the single-alien habeas action filed just over a year ago. Plaintiffs—a group of individuals and immigrant-advocacy organizations—transformed a dispute over individual detention into a systemic challenge to federal immigration enforcement throughout the Los Angeles area. That dispute culminated in an injunction barring immigration officers from relying solely on four factors in making investigative stops: (1) apparent race or ethnicity; (2) speaking Spanish or speaking English with an accent; (3) presence at a particular location; and (4) occupation. The Supreme Court intervened and stayed the injunction.

Roughly a year later, however, the district court entered a substantially similar injunction, superficially collapsing the four factors into two and prohibiting officers from relying solely on "apparent status as low-income or working-class and Latino" to conduct stops. Dkt. 823 ("Op.") at 83. That injunction is just as flawed as the one previously stayed by the Supreme Court, if not more so. Its reliance on "apparent status as low-income or working-class" introduces even greater vagueness than the four factors enjoined in the prior injunction, leaving officers without a meaningful standard to guide their conduct. And Plaintiffs are even less able to establish Article III standing to seek prospective relief against stops relying exclusively on the two factors now in question.

A stay is amply warranted here again. Most fundamentally, the Supreme Court already stayed a similar injunction in this very case. That interim order must "inform

how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Rather than give *any* genuine effect to the Supreme Court's stay order, the district court invoked a decision by a motions panel of this Court denying the stay that the Supreme Court subsequently granted. The district court's approach defies *Boyle* and flouts elementary principles of vertical *stare decisis*.

Past orders/*Boyle* aside, the government has again made a "strong showing" of likely success on the merits. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). As the Supreme Court has repeatedly explained, past exposure to allegedly illegal conduct does not create Article III standing for prospective injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Nor have Plaintiffs established that anyone faces a certainly impending stop or arrest in violation of the Fourth or Fifth Amendments—let alone on the amorphous socio-economic bases that the district court proscribed. Such standing deficiencies recently led this Court to lift a similar preliminary injunction. *See United Farmworkers of Am. v. Mullin*, 2026 WL 2754794, at *1 (9th Cir. Aug. 24, 2026). That result should obtain here.

The injunction also rests on a misunderstanding of the Fourth Amendment. No one contends that appearing "working-class and Latino" (assuming *arguendo* those categories carry a meaning readily discernible to officers) *always* creates reasonable suspicion for a stop. Nor does anyone suggest those are the *only* factors federal agents ever consider. But in many situations, such factors—considered as part of the totality of the circumstances—can heighten the likelihood that someone is unlawfully present

in the United States, above and beyond the 1-in-10 baseline odds in the Central District of California. Immigration officers are therefore entitled to rely on those factors when enforcing immigration laws, and courts may not impose categorical rules restricting the totality-of-the-circumstances inquiry for reasonable suspicion.

The district court additionally exceeded the limits on equitable relief that the Supreme Court reaffirmed in *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025). Because the injunction effectively bars the government from conducting *any* stop in the Central District without threat of contempt litigation, even if the stop does not involve Plaintiffs or their members, it runs afoul of bedrock equitable principles.

The district court's vague, class-based standards also fail to supply the requisite clarity that Rule 65 demands for injunctions. To the extent that its nebulous terms are enforceable at all, the injunction entered below is—once again—an impermissible follow-the-law injunction.

The remaining stay factors tip decisively in the government's favor, as the Supreme Court already found—and *Boyle* requires this Court to find now. The government will suffer irreparable harm without a stay. The preliminary injunction creates an untenable regime in which a federal court will micromanage every operation and stop conducted in a District of 20 million people by reference to vague, undefined terms like "working-class" and "low-income." That extraordinary intrusion into the Executive's enforcement authority unquestionably undermines the public interest, hobbles the uniform enforcement of federal immigration law, raises significant public

safety concerns, and will cause serious operational problems. *See* Ex. A, 3, 5-6; Ex. B, 5-6. On the other side of the ledger, Plaintiffs remain fully protected by the Fourth and Fifth Amendments and have failed to establish any likelihood of irreparable injury from the issuance of a stay.

This Court should also stay proceedings in the district court pending disposition of the government's appeal. After all, an appeal could substantially narrow the jurisdictional issues presented or even dispose of the entire case. Without a stay of proceedings, this Court and the district court could potentially decide the same legal questions simultaneously, risking incongruent results. The pendency of appeals raising identical legal issues in other courts of appeals further confirms the need for a stay of proceedings.

The government therefore respectfully requests a stay of the district court's preliminary injunction pending appeal, a stay of district court proceedings pending resolution of the appeal, and an immediate administrative stay.

## STATEMENT

**A.** Congress charged Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP), components within the Department of Homeland Security (DHS), with enforcing and administering federal immigration laws. *See* 6 U.S.C. §§202, 211(c)(8), 252(a)(3). Immigration officers can detain individuals for questioning based on "reasonable suspicion" of illegal presence in the United States. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).

Based on the latest data from DHS, roughly 20 million people reside in the Central District of California, 46% of whom are Hispanic. Ex. A, 4. ICE estimates that Los Angeles County has a population of 10 million, with 3.5 million immigrants and nearly one million illegal aliens. Ex A, 4 n.6; Ex. B, 7-8 (similar percentage of illegal immigrants across the District). Given those statistics, the Central District of California is one of the most important regions for immigration enforcement in the country. Ex. B, 7-8. Officers processed approximately 8,066 immigration arrests in the District for Fiscal Year 2025. Ex. A, 6.

On June 6, 2025, Operation At Large Los Angeles ("OAL") began, and CBP agents were deployed into the Central District to support ICE with enforcement of immigration laws. *See* Dkt. 582, Exs. A, B.

**B.** On July 2, 2025, Plaintiffs—five individuals and four organizations—sought an injunction prohibiting federal officers from conducting detentive stops without reasonable suspicion and restricting reliance on four enumerated factors: (1) apparent race or ethnicity; (2) speaking Spanish or accented English; (3) presence at certain locations; and (4) type of work. The district court issued an open-ended temporary restraining order (TRO), enjoining the government from relying solely on those four factors, "alone or in combination," to form reasonable suspicion. *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 897 (C.D. Cal. 2025). The government appealed and sought a stay, which this Court denied. *Vasquez Perdomo v. Noem*, 148 F.4th 656, 690 (9th Cir. 2025).

The Supreme Court then stayed the district court's injunction. *Perdomo*, 146 S. Ct. at 1. Justice Kavanaugh explained in his concurrence that the government had "demonstrated a fair prospect of success on the merits." *Id.* at 6 (Kavanaugh, J., concurring). Plaintiffs "likely lack Article III standing," Justice Kavanaugh asserted, because their "standing theory largely tracks the theory rejected in *Lyons*." *Id.* at 2. On the merits, Justice Kavanaugh recognized that "the Government has a fair prospect of succeeding on the Fourth Amendment issue." *Id.* at 3.

**C.** Although a majority of the Supreme Court determined that the government had satisfied the demanding standard for a stay, the district court permitted expansive, expedited discovery. That "limited" discovery has involved 230 requests, examination of 4.3 million pages of documents, and more than 13,000 hours of work by over 300 reviewers. Ex. C.

OAL demobilized on February 16, 2026. A few months later, Plaintiffs filed a motion for preliminary injunction. The district court granted the preliminary injunction on October 23, 2026. Op. 1. In the district court's view, both the individual and organizational Plaintiffs had standing and were likely to succeed on their Fourth and Fifth Amendment claims. The preliminary injunction prohibits immigration officers from "conducting detentive stops in" the Central District "based on racial stereotyping, rather than a pre-stop individualized, particularized assessment of reasonable suspicion that the person to be stopped is present within the United States in violation of U.S. immigration law." Op. 83. In developing reasonable suspicion, immigration officers

"may not rely solely on apparent status as low-income or working-class and Latino, even when an identified target is allegedly low-income or working-class and Latino." Op. 83. The district court also certified two classes—the Suspicionless Stops Class and First Discriminatory Treatment Class, *see* Dkt. 825—but did not limit the preliminary injunction's relief to those two classes.

The government timely appealed and moved for a stay pending appeal and stay of proceedings, both of which the district court denied on November 2, 2026. Dkt. 840. The government now seeks that relief from this Court.

## ARGUMENT

The government is entitled to a stay pending appeal because it is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay. *Nken,* 556 U.S. at 425-26.

The government also satisfies the requirements for a stay of proceedings. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Under the three-factor test set forth in *Landis*, courts examine: (1) "the possible damage which may result from the granting of a stay"; (2) "the hardship or inequity which a party may suffer [if the case is allowed] … to go forward"; and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (citation omitted). Those factors strongly favor a stay of proceedings in this case.

Additionally, this Court should grant an immediate administrative stay.

## I. THIS COURT SHOULD GRANT A STAY PENDING APPEAL

### A. The Government Is Likely To Prevail On The Merits

**1.** The Supreme Court's earlier stay decision must guide the application of the stay factors here. Although interim orders do not conclusively resolve the merits, they must "inform how a court should exercise its equitable discretion in like cases." *Boyle*, 145 S. Ct. at 2654. The district court discounted the stay because "an unreasoned stay order cannot give the Court basis in law to adjudicate" Plaintiffs' motion. Op. 49 n.32. That approach overlooks the most straightforward, inescapable implication of the stay—that at least five Justices concluded that the government had made a "strong showing" of likely success in challenging an injunction very similar to the one at issue here. *See Nken*, 556 U.S. at 434.

The district court's attempt to distinguish *Boyle* based on differences in the evidentiary record is deeply flawed and ultimately unavailing. According to the district court, "the Supreme Court's reasons" for granting a stay "may well have involved the evidentiary record that Plaintiffs had developed at the TRO stage—which … meaningfully differs now." Op. 53 n.35. But the expanded record only offers more of the same type of evidence that the Supreme Court deemed insufficient to sustain the earlier injunction. Although the district court acknowledged that the government now (as then) has *written* policies forbidding reliance on race alone to establish reasonable suspicion, it instead credited a smattering of individual arrests, isolated remarks by a handful of officers taken out of context, increased immigration

enforcement generally, and the subjective impressions of declarants, many of whom are not parties to this case.

Nor was the district court right to justify its ruling by invoking a decision by a motions panel of this Court denying the very stay that the Supreme Court later granted. *E.g.*, Op. 49 n.32. Indeed, that turned vertical *stare decisis* upside down, elevating an intermediate court's holding over a directly contrary decision of the Supreme Court on an identical set of issues. And even if the Supreme Court's decision did not specify its precise reasoning for granting the stay of the TRO, the Supreme Court unquestionably and necessarily found—contrary to this Court's analysis—that the government was likely to succeed on the merits and had demonstrated irreparable harm. The district court cannot conclude that the issues are sufficiently identical to warrant reliance on this Court's stay decision, *see E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021), yet insufficiently similar to give force to the Supreme Court's later stay of that decision, especially in light of *Boyle*.

*DHS v. D.V.D.* illustrates where that approach leads. There, lower courts failed to give effect to the Supreme Court's stay order, compelling the Supreme Court to intervene *three separate times*. *See DHS v. D.V.D.*, No. 26A406 (U.S. Sept. 29, 2026) (granting third stay). The district court appears determined to follow the same course. But this Court should heed the Supreme Court's stay order that the district court brushed aside.

**2.** Insofar as the new injunction differs from the previous one, Plaintiffs even more plainly lack Article III standing for prospective injunctive relief. Article III requires Plaintiffs to demonstrate a "certainly impending" future injury, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013), that is "real and immediate," *Lyons*, 461 U.S. at 103. The prospect of a stop based solely on two factors rather than the four factors in the prior injunction is even more remote, making Plaintiffs' theory of future injury all the more speculative.

**a.** As Justice Kavanaugh recognized, *Lyons* controls this case. There, the Supreme Court assumed the "routine[] appl[ication]" of the alleged chokehold policy but still concluded that the plaintiff failed to show a "real and immediate threat of injury necessary to make out a case or controversy." *Id.* The district court sought to brush away *Lyons* by stressing that the individual Plaintiffs face a real and immediate threat of another stop without reasonable suspicion under the district court's vague race- and class-based standards. Op. 62-63.

The record belies that conclusion. Plaintiff Gavidia, a U.S. citizen, alleges that agents stopped him at a tow yard because of his "skin color." Dkt. 632-13, ¶¶6-12. Plaintiff Hernandez Viramontes, also a U.S. citizen, alleges that agents took him from his workplace for about twenty minutes to verify his citizenship. Dkt. 632-14, ¶¶8-11. Both claim they fear another encounter because they match the "precise demographic profile" immigration officers purportedly target. Dkt. 632 at 22-26; Dkt. 710 at 13-14; *see* Dkt. 632-13, ¶¶12-13; Dkt. 632-14, ¶¶15. Plaintiffs Perdomo and Molina were

detained and later released on bond pending removal proceedings. Dkt. 81-1, ¶¶4-5. Plaintiff Osorto was also released from his original detention. Dkt. 419 at 2, 33. Subjective fear of a future illegal stop "is not certainly impending" and "cannot manufacture standing." *Clapper*, 568 U.S. at 416. Plaintiffs' employment in areas where immigration officers may conduct enforcement operations, a factor heavily relied on by the district court, Op. 63, does not render a future unlawful stop any less speculative. None of them has been stopped again in over a year—let alone stopped again based exclusively on the district court's two factors and without reasonable suspicion.

**b.** Plaintiffs' theory of associational standing is similarly without substance. Associational standing requires proof, among other things, that an organization's "members would otherwise have standing to sue in their own right" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt* v. *Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). But, just as with the individual Plaintiffs, any risk of future harm for the organizations' members is speculative. *See id.* at 381 (citing *Clapper*, 568 U.S. at 409). Additionally, organizations may not assert the Fourth Amendment rights of others—which is precisely what Plaintiffs' organizational-standing theory attempts to do. *Alderman v. United States*, 394 U.S. 165, 174 (1969). And at most, the organizations' members demonstrate past, isolated injuries unlikely to recur. *See Perdomo*, 146 S. Ct. at 2 (Kavanaugh, J., concurring); *see also Tincher v. Mullin*, 2026 WL 2797318 (D. Minn. Sept. 18, 2026); *Hussen v. Noem*, 822 F. Supp. 3d 944, 999 (D. Minn. 2026); *FDA v. All.*

*for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143-44 (9th Cir. 2024) (no associational standing for warrantless searches where chance of future injury is merely speculative).

Nor can organizational Plaintiffs salvage their standing from statistical inference. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). To start, the Supreme Court has rejected reliance on "statistical probabilities" to establish Article III standing. *Id.* But even if that discredited approach were viable in the abstract, it is unavailing for Plaintiffs here. Plaintiffs cannot have it both ways: to the extent apparent Latino ethnicity and working-class status "describe an extremely broad profile" that encompasses too many people to justify individualized reasonable suspicion for Fourth Amendment purposes, Op. 52, it is unclear why any particular member of the large relevant population would have a nonspeculative likelihood of being encountered and detained again. Roughly twenty million people reside in the Central District, about half are Hispanic, and about two million are unlawfully present. But immigration officers made only 8,066 arrests in fiscal year 2025—about 0.4% of the relevant population. Ex. A, 6. Those figures hardly establish that immigration officers will again encounter any particular Plaintiff, much less subject that individual to an unlawful stop.

**3.** The district court attempted to paper over this gap by invoking circuit precedent holding that harm inflicted by "a pattern of officially sanctioned behavior" is automatically likely to recur. Op. 62-63. Never mind that there is no evidence of an official "Racially Based Stops Policy." Op. 67. Even the district court conceded that the

alleged *unwritten* policy would contradict the agency's *written* policy and established training. Op. 48. Indeed, this so-called policy is largely cobbled together from the subjective (and motivated) beliefs of those subject to immigration enforcement, many of whom are not parties to this case. *See*, *e.g.*, Op. 66 (organization member stated agents "seem to target non-white, Spanish-speaking workers"); *id.* ("four members, all of whom were day laborers and/or Latino, were detained"). That is effectively just Plaintiffs' worldview, rather than any actual policy.

Even if the record were otherwise, the district court's reasoning is irreconcilable with *Lyons*. *Lyons* accepted *arguendo* allegations that "police officers, 'pursuant to the authorization, instruction and encouragement of defendant City of Los Angeles, regularly and routinely appl[ied]'" the chokeholds that the plaintiff sued to enjoin. 461 U.S. at 98. Nonetheless, *Lyons* dismissed as irrelevant to standing whether the plaintiff "seeks to enjoin only an 'established,' 'sanctioned' police practice assertedly violative of constitutional rights." *Id.* at 108. The Court explained that, "to have a case or controversy with the City that could sustain [his claim for injunctive relief ], Lyons would have to credibly allege that he faced a realistic threat from the *future application* of the City's policy." *Id.* at 106 n.7 (emphasis added). And contrary to the district court's suggestion, Op. 61, this Court's decision in *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), did not depart from—much less displace—*Lyons* and *Clapper*. Not could it have, as this Court recently made clear. *See United Farm Workers*, 2026 WL 2754794, at *1

(lifting preliminary injunction because past harm is insufficient to "establish standing to seek prospective injunctive relief" (relying on *Lyons*, 461 U.S. at 102)).

**4.** In granting the preliminary injunction, the district court also misapplied the Fourth Amendment and equal-protection principles.

**a.** To start, the injunction violates basic Fourth Amendment principles and common sense. The Fourth Amendment permits detentive stops based on reasonable suspicion. *Brignoni-Ponce*, 422 U.S. at 880. Reasonable suspicion encompasses "specific articulable facts, together with rational inferences from those facts," that a person is unlawfully present in the United States. *Id.* at 884. The inquiry "turn[s] on the totality of the particular circumstances." *Brignoni-Ponce*, 422 U.S. at 885 n.10; *see United States v. Arvizu*, 534 U.S. 266, 273 (2002). By definition, no particular circumstantial factor is categorically off-limits—whether that factor is a person's appearance, behavior, or the officer's past experience with the particular offense, location, or suspect. *See, e.g.*, Ex. B, 4 (collecting examples of reasonable-suspicion factors in the immigration-enforcement context). Nor may courts replace that individualized inquiry with rigid rules dictating the weight of specific factors.

Here, the question is what constitutes reasonable suspicion for illegal presence in the United States—a status shared by an estimated 10 percent of the population of the Central District of California, or about 2 million people within the District. In that context, the two factors enumerated in the district court's injunction are plainly relevant. To take one example, agents may know that a particular low-wage occupation (e.g.,

construction, agriculture, car washing) disproportionately attracts illegal immigrants because it does not require documentation or verification. Ex. B, 4. That fact may support reasonable suspicion, even if the occupation also qualifies as "low-income or working-class" under the district court's undefined standard. *See, e.g., Maldonado* v. *Holder*, 763 F.3d 155, 161 (2d Cir. 2014) (noting that day labor is "an occupation that is one of the limited options for workers without documents"). Likewise, apparent ethnicity can be a factor supporting reasonable suspicion in appropriate circumstances. *See Brignoni-Ponce*, 422 U.S. at 885-886.

All of this reflects common sense: the reasonable-suspicion threshold is low, and the number of people who are illegally present and subject to detention and removal under the immigration laws in the Central District is extraordinarily high and starts off at a 1-in-10 probability just among the general population. The district court wrongly dismissed sole reliance on the two factors as categorically insufficient to supply reasonable suspicion in any context because they "describe only a broad profile." Op. 52. Just because the two factors may not supply reasonable suspicion in *some* circumstances, however, does not mean they will *never* do so or are categorically irrelevant. Reasonable suspicion is context-dependent and cannot be reduced to per se rules. Indeed, the Supreme Court has repeatedly overturned decisions imposing such rules. *See Arvizu*, 534 U.S. at 272; *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *United States v. Banks*, 540 U.S. 31, 34, 41-42 (2003).

Nor is there any basis to conclude that officers relied solely on the two factors in conducting the challenged stops. Even the district court acknowledged evidence concerning flight but incorrectly reasoned that flight from immigration officers "does not create reasonable suspicion." Op. 41-43; *but see Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). And it is hardly surprising that officers often end up stopping people collateral to their intended targets at locations where suspected immigration violations occur and individuals flee. Dkt. 582-6 at 4 (Plaintiff admitting to "run[ning] away"). Plaintiffs instead offer only speculation that their apparent ethnicity prompted the stops. *E.g.*, Dkt. 529-15 at 6 (offering as evidence supporting putative racial basis for stop bare speculation that: "I think that I was arrested that day … because of how I look."). But roughly 8,000 arrests among about 10,000,000 Latinos flatly contradict any suggestion that officers stop individuals "just because they look Latino." Op. 3.

**b.** For similar reasons, the district court erred in concluding that the government violated the Equal Protection Clause because "apparent Latino race and low-income status are improperly constituting the core of the reasonable suspicion analysis." Op. 56. Economic status is not a suspect classification, and rational basis review applies to the government's "facially neutral" immigration policies. *Trump v. Hawaii*, 585 U.S. 667, 704-05 (2018). Nothing in the record suggests that officers selectively enforce immigration laws based on race—for example, by targeting illegally present Latino aliens but not similarly situated Russian aliens. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, Plaintiffs' equal-protection claim reduces to an allegation of disparate

impact. But the Supreme Court has consistently recognized that, "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of," for example, "recipients of any cross-cutting immigration relief program." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34 (2020). If such disparate impacts sufficed to make out a claim, "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.*

**5.** The injunction also flagrantly departs from the Supreme Court's holding in *CASA*, which forbids the issuance of universal (i.e., non-party-specific) injunctions. The district court did not merely enjoin the government from stopping Plaintiffs without reasonable suspicion; it enjoined the government from conducting such stops of any of the 20 million people within the Nation's most populous federal judicial district. That extreme mismatch between Plaintiffs' asserted injuries and the district court's universal relief flouts *CASA*. Nor could the district court justify that sweeping relief by certifying Plaintiffs' Suspicionless Stops Class and First Discriminatory Treatment Class. That certification was manifestly improper (e.g., class members lack standing), *see* Dkt. 689, and in any event, the Court did not even confine the injunction's reach to those class members.

**6.** The injunction's vague terms similarly run afoul of Federal Rule of Civil Procedure 65(d). Rule 65 provides that "[e]very order granting an injunction … must," among other things, "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B)-(C). The

injunction nowhere defines "working-class" or "low-income," much less explains how immigration officers can ascertain an individual's economic status in the field. *See* Ex. A, 3, 5-6; Ex. B, 5. As a simple example, what percentage of the U.S. population is "working class" or "low-income"? Answers likely vary wildly, underscoring the hopelessly subjective and ambiguous nature of class.

The district court's reliance on such amorphous and indeterminate notions of class is more suited to faculty lounge discussions rather than crafting injunctions capable of practical, on-the-ground application. That uncertainty leaves officers to guess whether their conduct falls within the injunction's prohibitions, denying them the specificity required by Rule 65(d) to guide their conduct or protect them from the constant threat of contempt. Officers should not be subject to contempt in the event that their assessment of socio-economic class differs from a district judge's.

Even assuming the preliminary injunction accurately reflects the Fourth Amendment's requirements, it merely commands immigration officers to follow the law. An injunction that bars immigration officers from "conducting detentive stops … based on racial stereotyping, rather than a pre-stop individualized, particularized assessment of reasonable suspicion," Op. 83, adds nothing to what the Constitution already demands and is instead an impermissible "bare injunction to follow the law." *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014).

### B. The Remaining Stay Factors Tip Decisively In The Government's Favor

The balance of harms, equities, and public interest overwhelmingly favor a stay pending appeal. *See Nken*, 556 U.S. at 435.

**1.** The injunction inflicts irreparable harm on the government and public. Most immediately, the district court's order irreparably harms the government by broadly hindering enforcement of the immigration laws in a critically important region containing about 2 million illegal aliens. "The problems caused by illegal immigration" from "crime" and "safety risks" to the consumption of limited public resources "must not be underestimated." *Arizona* v. *United States*, 567 U.S. 387, 398 (2012) (citation omitted). Because illegal aliens "create significant economic and social problems" and are "vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation," "the public interest demands effective measures to prevent the illegal entry of aliens." *Brignoni-Ponce*, 422 U.S. at 878-79.

The Los Angeles area remains a crucial priority for immigration enforcement where millions of aliens remain illegally. *Perdomo*, 146 S. Ct. at 1 (Kavanaugh, J., concurring). Preventing the Executive Branch from implementing a major enforcement priority in that area and effectuating the immigration laws Congress enacted constitutes irreparable harm. The government further suffers irreparable harm from a universal injunction that supplants the political Branches' judgments and intrudes on the separation of powers. *See CASA,* 606 U.S. at 859.

The overbroad injunction will similarly chill lawful immigration enforcement. The injunction threatens officers with contempt proceedings and sanctions if the court disagrees *ex post* with their view of whether a particular factual backdrop provided reasonable suspicion for a detentive stop. And it will do so anywhere the factors the district court identified—often relevant in the reasonable-suspicion calculus—are implicated in an immigration stop, which will be most of the time given the demographics of Los Angeles. That judicial second-guessing will deter officers from stopping suspects even when they have reasonable suspicion *on other grounds* to believe an individual is here illegally. *See* Ex. A, 6; Ex. B, 6-7; *Perdomo*, 146 S. Ct. at 4 (Kavanaugh, J., concurring).

The injunction's vague prohibition on making stops based on a person's "status as low-income or working-class and Latino," Op. 83, compounds that chill. *See* Argument §I.A.6, *supra*. Officers must therefore guess at the bounds of permissible conduct, further tipping the balance of equities against preliminary relief.

Micromanaging the Executive Branch's lawful use of stops and arrests in a region with millions of illegal aliens weighs strongly in favor of staying the injunction, especially when the Supreme Court has previously concluded, based on a similar record, that the government was likely to prevail in challenging a similar injunction. *See Perdomo*, 146 S. Ct. at 6 (Kavanaugh, J., concurring). Nor does the Judiciary "set immigration policy or decide enforcement priorities"; it merely "ensure[s], in justiciable cases, that the Executive Branch acts within the confines of the Constitution and federal statutes." *Id.*

at 5-6. As explained above, the government's conduct fits comfortably within those boundaries.

**2.** The balance of the equities also favors the government. Without a preliminary injunction, Plaintiffs will face no irreparable harm. They remain fully protected by the Fourth Amendment and by DHS policy that is fully consistent with the Constitution and federal law. Plaintiffs' lack of Article III standing likewise forecloses a finding of irreparable harm. And even if another future stop were reasonably likely, the injunction would fail to prevent such a stop because it *permits* investigative stops that are based on more than the enumerated factors. Finally, "[t]he interests of individuals who are illegally in the country in avoiding" arrest "is ultimately an interest in evading the law," which "is not an especially weighty legal interest." *Perdomo*, 146 S. Ct. at 5 (Kavanaugh, J., concurring).

## II. THIS COURT SHOULD GRANT A STAY OF PROCEEDINGS

The government respectfully requests that the Court stay proceedings below until the merits of the government's appeal are decided. *See Landis*, 299 U.S. at 254. This Court has followed that path in similar cases involving novel constitutional theories, questionable standing, and burdensome discovery. *See Dickinson v. Trump*, 174 F.4th 634, 650 (9th Cir. 2026) (granting stay and explaining that "discovery need not continue in the district court pending appeal"); *Reach Cmty. Dev. v. DHS*, 174 F.4th 1143, 1151 (9th Cir. 2026) ("[T]here is no need for discovery to continue in the district court pending appeal.").

The circumstances here call for a similar stay. This case has proceeded through extraordinarily burdensome discovery, despite Supreme Court precedent that forecloses the premises of Plaintiffs' claims—on both standing and the merits. In *Dickinson*, for instance, this Court stayed proceedings to avoid unwarranted litigation burden pending resolution of controlling legal questions. The litigation burden entailed "11 witnesses for deposition[]" and "approximately 112 videos and 1,600 pages of documents." *Dickinson v. Trump*, No. 26-1609, Mot. for Stay at 22 (9th Cir. Mar. 18, 2026). That burden pales in comparison to the ongoing discovery here. Plaintiffs seek 60 depositions, the district court has ordered the production of nearly 5,000 videos and roughly 1,000 devices, and over 300 reviewers have spent 13,000 hours reviewing 4.3 million pages of documents, with many more millions in the pipeline. Ex. C, ¶¶5, 8, 14 (citing Ex. D). This case calls out for a stay of lower court proceedings while this Court considers key threshold legal questions that will substantially impact the future of the litigation. Allowing further litigation in a case that has already generated ***840*** docket entries in just over a year while threshold legal issues are now on appeal is not an effective use of the district court's or the parties' resources.

## III. AN IMMEDIATE ADMINISTRATIVE STAY IS WARRANTED

The government also respectfully requests that this Court grant an administrative stay of the district court's October 23 order while the Court considers this motion. Every day that the district court's order remains in effect, law-enforcement officers throughout the most populous District in the country are laboring under the threat of

judicial contempt, daunted by the prospect that their good-faith efforts to enforce federal law will be retrospectively deemed to violate a far-reaching, unlawful, and ill-defined injunction.

## CONCLUSION

For the foregoing reasons, the Court should stay the preliminary injunction pending appeal, stay district court proceedings pending resolution of the government's appeal, and grant an immediate administrative stay.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

AUGUST FLENTJE
JONATHAN ROBBINS
*Office of Immigration Litigation*

*s/Daniel F. Mummolo*
DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney General*

*Counsel for Defendants-Appellants*

*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6054*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Ninth Circuit Rules 32-3 and 27-1(1)(d) because it contains 5,591 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word in Garamond 14-point font, a proportionally spaced typeface.

*s/Daniel F. Mummolo*
DANIEL F. MUMMOLO

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. Service will be accomplished by the appellate ACMS system.

*s/Daniel F. Mummolo*
DANIEL F. MUMMOLO

# EXHIBIT A

!

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pedro VASQUEZ PERDOMO, et al.,<br>Plaintiffs,<br>v.<br>MARK WAYNEMULLIN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br>Defendants. | Case No. 2:25-cv-05605<br><br>**DECLARATION OF ANDRE QUINONES** |

**DECLARATION OF ANDRE QUINONES**

I, Andre Quinones, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as a Deputy Field Office Director (DFOD) of the Los Angeles Field Office (ERO Los Angeles). I have held this position since June 2020.

2. I have been employed by ICE, or its predecessor, Immigration and Naturalization Service (INS), since June 2000. In April 2011, I was promoted to Supervisory Detention and Deportation Officer and in October 2016, I was promoted to Assistant Field Office Director. In June 2020, I was promoted to Deputy Field Office Director (DFOD). During my career, I have also served as the Acting Field Office Director (FOD) in Los Angeles.

3. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former INS and the former U.S. Customs Service, to more effectively enforce federal

immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by Field Office Directors (FODs); (2) Homeland Security Investigations, which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which includes 9 regions led by Regional Counsels.

4. ERO's mission is to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

5. The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

6. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

7. ICE ERO Los Angeles officers receive law enforcement training on the requirements of the Fourth Amendment of the U.S. Constitution, and the related statutory and regulatory provisions of the Immigration and Nationality Act (INA) as part of their basic Academy training at the Federal Law Enforcement Training Center. Currently, ICE ERO Los Angeles officers receive Ninth Circuit-specific immigration enforcement training in addition to the general Fourth Amendment training three times per year. This training includes the statutory requirements for warrantless arrests under 8 U.S.C. § 1357(a)(2),

the requirements of having and documenting reasonable suspicion and/or probable cause, and the requirements of consensual encounters.

8. ICE ERO Los Angeles officers are trained that, under the law, brief detention for questioning requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is an alien illegally in the United States. ICE ERO Los Angeles personnel are trained that an arrest requires probable cause that the person being arrested is an alien illegally present in or otherwise removable from the United States.

9. ICE ERO Los Angeles officers are trained to follow ICE procedures for apprehensions of illegal or otherwise removable aliens in the United States by using targeted investigations, conducting operations, and making arrests. Individual targeting packages, consisting of the targeted alien's immigration history and/or status, criminal history, last known residence and employment information are prepared during the targeted investigation, prior to contact with the targeted alien. Targeted investigations generally focus on aliens with final removal orders and/or serious criminal history. When non-targeted individuals are encountered during the targeted operations, ICE ERO Los Angeles officers are trained to develop reasonable suspicion through consensual encounters. ICE ERO Los Angeles officers identify themselves to the arrestee at the time of arrest/encounter or as soon as practicable when safe to do so.

10. I am familiar with the District Court's preliminary injunction order (ECF No. 807), which is referred to herein as the PI Order.

11. The PI Order requires immigration officers and agents to use the "totality of the circumstances" in developing reasonable suspicion but determines the factors of being: (1) "apparent status as low-income or working-class" and (2) "Latino" are "not enough, standing alone, to provide reasonable suspicion [for an investigatory stop]." These terms are vague, ambiguous and, largely, undefined. As a result, implementation of PI Order will pose significant operational challenges, and further, will have a chilling effect on immigration enforcement in the Central District of California. This judicial micromanagement of officer decision making has a chilling effect since an officer has always been free to rely on many factors alone or in combination.

12. The term "Latino" as defined in the PI Order is vague.[1] The court notes that an individual may appear to be Latino based on the observer's perception of the individual's: (1) ethnic background, (2) race, and/or (3) skin color. The court also notes that it believes the term "Hispanic" synonymous for "Latino." In an effort to define "Latino," the court cites to a Pew Research article that begins by saying, "[t]here's no simple answer to the question 'Who is Hispanic?'"[2] Without clarification of who is "Latino," ICE law enforcement officers and agents cannot determine whether an individual meets these criteria by perception alone. The court's order requires ICE law enforcement personnel to make snap decisions in the field about whether an individual is "Hispanic" or "Latino" based on little more than their apparent physical appearance. Rather these terms relate to the part of the world an individual comes from and the language they speak.[3]

13. The problems posed by this vague language are compounded by the population of removable aliens in California. According to ICE's national docket, there are 614,469 aliens in California who self-identified as being from Latin American countries[4] and were already encountered and subject to removal. There are only 195,015 aliens from all other countries combined. Put another way, approximately 76% of aliens who were already encountered in the past by a DHS component in California and subject to removal are from Latin America. According to information posted by the United States District Court for the Central District of California, the population of the district of 19,384,341 was 46% Hispanic in 2020.[5] Accordingly, it is highly probable that an alien encountered in this District will part of the population subject to the PI Order.[6]

---

[1] PI Order at 3 n.1.

[2] Mark Hugo Lopez, Joseph Copeland & Jeffrey S. Passel, *Who Is Hispanic?*, Pew Rsch. Ctr. (Sep. 15, 2026), https://www.pewresearch.org/short-reads/2026/09/15/who-is-hispanic/.

[3] *Latino*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/Latino (Accessed on Oct. 28, 2026); *Hispanic*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/hispanic (Accessed on Oct. 28, 2026).

[4] Latin American countries include Costa Rica, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Cuba, Dominican Republic, Haiti, Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela. *Latin American Countries*. WorldAtlas (May 21, 2021). https://www.worldatlas.com/geography/latin-american-countries.html.

[5] *2020 Central District of California Profile*, United States District Court Central District of California, https://www.cacd.uscourts.gov/sites/default/files/documents/2020%20Central%20District%20of%20California%20Profile.pdf (Accessed Oct. 26, 2026).

[6] See *Undocumented Immigrants in Los Angeles County, 2025 Data Estimates*, USC Dornsife Equity Research Institute, https://dornsife.usc.edu/eri/wp-content/uploads/sites/41/2025/11/USC_ERI_LA_County_Undoc_Estimates_…

*(footnote cont'd on next page)*

14. Similar operational challenges are posed by the economic categorization under the PI Order. The term "working-class" is undefined but is noted to "explicitly include[ ] individuals who appear to be low-income laborers and day laborers."[7] The term "low-income" is similarly not defined in the PI Order. The court does not provide a maximum household income for who it has determined are "low-income" individuals. Operationally, it is not possible for ICE law enforcement personnel to determine an individual's income while in the field conducting enforcement actions.

15. The court also does not provide any physical characteristics typical of those it has deemed to be "working class" or "low-income." Neither term is legally definable or a quantifiable, objective metric that the officer on the ground can apply. Officers trained to evaluate articulable facts are now chilled from acting in environments where standard appearance or occupational indicators (such as work uniforms or construction apparel commonly associated with targeted worksites) overlap with the court's undefined prohibitions. Additionally, a person's appearance (clothing brand, grooming, vehicle models, types of footwear, etc.) is unreliable when determining income level, which can potentially lead officers to make other stereotypical assessments that the court is mandated to prevent. For example, a worker at a construction site may be dressed in an ill-fitting hooded sweatshirt, stained jeans, dirty work boots, and a high visibility vest. Under the court's view, ICE officers and agents may be second guessed based on stereotypical factors that a court could ascribe as reflecting "low-income" solely due to his physical appearance—and therefore subject to special protections from immigration enforcement—when in fact he may be a site manager and earn a salary that places him outside the court's undefined "low-income" status. In other words, the court is likely to employ improper stereotypes for all "working class" or "low-income" individuals (such as being poorly dressed and groomed) and providing such individuals increased protection from immigration enforcement and distorting the actual requirement to consider all facts and circumstances. Accordingly, it is not possible for ICE law enforcement personnel to identify an

---

(Accessed on Oct. 28, 2026)(finding that 35% of Los Angeles County residents are immigrants (3.5 million) and 27% of them are "undocumented" (948,000)) ; *Changing Origins, Rising Numbers: Unauthorized Immigrants in the United States*, Migration Policy Institute (Oct. 2025) https://www.migrationpolicy.org/sites/default/files/publications/mpi-unauthorized-immigrants-fact-sheet-2025_FINAL.pdf?shem=aimgspe,(estimating there are1,101,000 "unauthorized immigrants" in Los Angeles County).

[7] PI Order at 3 n.2.

individual the court has determined are "working class" or "low-income," as opposed to middle class or affluent individuals.

16. As an additional example, an officer with knowledge of an organization alleged to have committed immigration violations with its hired staff will worry that they still lack reasonable suspicion to conduct an investigation of workers entering the facility, given that the probability of a worker being Hispanic is higher in the Central District. Therefore, if the demographic profile of the targeted workforce matches the general demographic profile of the surrounding community's working-class population, an instruction to ignore those factors will chill the officer's ability to act on worksite allegations

17. ERO has processed approximately 8,066 immigration arrests in FY 2025, and 11,469 in FY 2026 in the Los Angeles Area of Responsibility.

18. In essence, the court is requiring ICE immigration officers and agents to racially and economically categorize potential immigration enforcement targets based on vague, undefined, and ambiguous terminology in order to apply the Court's injunction, and, more troublingly, draws a connection between individuals who appear to be "Hispanic" or "Latino" and those who are "working class" or "low-income." This is not operationally feasible to implement.

19. Based on my training and experience as a law enforcement officer, no level of suspicion is required for a consensual encounter. Officers are permitted to engage in consensual encounters with anyone, at any time, for any reason.

20. In addition, I understand that immigration officers are authorized by federal law to interrogate any alien or person believed to be an alien as to his or her right to be or remain in the United States.

21. The court's order and its ambiguous terminology and application, however, will likely chill the officer's enforcement of consensual and collateral encounters. Specifically, officers will be less likely to engage in immigration enforcement because the court's order effectively ensures the Court will second-guess immigration officers when exercising their enforcement authority in a substantial number of cases and creates uncertainty as to which individuals and encounters the court's order applies.

22. Moreover, because an officer's determination of reasonable suspicion, while based on a variety of factors such as employment and the place they are encountered, may be later construed as "relying solely on apparent status as low-income or working class," this judicial intervention will have a chilling

effect on immigration enforcement in the Central District. Therefore, the court's PI Order infringes upon otherwise valid and legitimate law enforcement determinations and effectively impedes federal immigration operations in the Central District of California, which accounts for approximately 19 million people, and is the most populous federal judicial district per the 2020 Census.[8]

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 28th day of October 2026 in Seattle, Washington.

ANDRE G QUINONES
Digitally signed by ANDRE G QUINONES
Date: 2026.10.28 19:29:38 -07'00'

Andre Quinones
Deputy Field Office Director
Enforcement and Removal Operations Los Angeles
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

[8] *District Population*, United States Attorney's Office Central District of California (Oct. 20, 2023) https://www.justice.gov/usao-cdca/our-district/district-population.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

Pedro Vasquez Perdomo, et al.,

Plaintiffs,

v.

Markwayne Mullin, et al.,

Defendants.

Case No. 2:25-cv-05605

**DECLARATION OF DANIEL I. PARRA**

**DECLARATION OF DANIEL I. PARRA**

I, Daniel I. Parra, declare and affirm as follows:

1. I am employed by U.S. Border Patrol, an operational component of U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP is charged with enforcing the Nation's immigration laws in order to protect national security and uphold the integrity of the immigration system. As part of this mission, CBP agents and officers are responsible for preventing the unlawful entry of individuals into the United States and apprehending those who attempt to enter illegally or who have violated the immigration laws. Through these activities, CBP seeks to secure the border, disrupt human smuggling and trafficking networks, and ensure consistent enforcement of the immigration laws of the United States.

2. I serve as the Deputy Chief Patrol Agent of the U.S. Border Patrol's El Centro Sector, overseeing operations and administrative functions across 70 miles of land border and inland areas of California extending to the Nevada and Oregon state lines. The El Centro Sector, located in Imperial County north of Mexicali, Baja California, Mexico, is a border region requiring complex operational management. I oversee a workforce of over 1,200 employees and manage a

multimillion-dollar budget. I have served in this capacity since May 8, 2022.

3. I entered on duty with the U.S. Border Patrol on July 28, 2002. Upon graduating from the 520th session of the U.S. Border Patrol Academy in Charleston, South Carolina, my first duty assignment was at the El Centro Station, El Centro Sector. Throughout my career, I have held progressive leadership positions across multiple sectors, demonstrating expertise in operational management, policy implementation, and program oversight. My assignments have included Supervisory Border Patrol Agent and Field Operations Supervisor, Indio Station; Executive Officer of Operations, El Centro Sector; Assistant Chief, U.S. Border Patrol Headquarters, Law Enforcement Operations Directorate – Pacific Corridor; Deputy Patrol Agent in Charge of Operations, Ajo Station, Tucson Sector; Patrol Agent in Charge, Blythe Station, Yuma Sector; and Division Chief, Law Enforcement Operational Programs, Tucson Sector. In these roles, I have led complex operational programs, strategic initiatives, and cross-sector coordination.

4. I have also served in various external and developmental assignments, which reflect the breadth of my leadership and strategic experience. I have completed overseas deployments in support of the U.S. State Department's Presidential Security Governance Initiative in Kenya, served as a staff member to the Assistant Commissioner for the Office of Professional Responsibility, and held developmental assignments with the Office of Training and Development as Acting Deputy Chief Patrol Agent and Acting Chief Patrol Agent of the U.S. Border Patrol Academy. I also served with the DHS Office of Strategy, Policy, and Plans as the Acting Deputy Assistant Secretary for Border Management, providing strategic oversight of the Department's national and border security operations.

5. Most recently, I served as Incident Commander for Operation At Large, leading one of DHS's most historic and complex interior enforcement missions. I served in this role from June

2025 to February 10, 2026, when U.S. Border Patrol's involvement in this operation ended. In this position, I had operational oversight and was responsible for all U.S. Border Patrol assets and operations in the greater Los Angeles area, as well as other cities throughout the United States. As part of a national, multi-agency effort, the mission focused on enhancing public safety and enforcing immigration law through targeted law enforcement actions. Furthermore, I ensured that personnel under my command had the proper resources and requisite training needed to operate in such a complex and fluid environment.

6. I am familiar with the preliminary injunction order entered in this case on October 23, 2026 (ECF No. 807), which is referred to herein as the PI Order.

7. The first paragraph of the PI Order requires CBP agents and officers conducting immigration enforcement activities outside of a port of entry, checkpoint, or the functional equivalent of the border to have reasonable suspicion that a person is violating federal immigration law before making a detentive stop. This simply restates what CBP agents and officers are trained to do and regularly do in the course of their duties.

8. Prior to engaging in investigative detentions, agents and officers are trained to have developed reasonable suspicion that the specific individual to be stopped has committed or is committing a federal crime or federal immigration violation. This determination is evaluated based on the totality of the circumstances. The factors that contribute to a reasonable suspicion analysis are numerous and include, but are not limited to: information from intelligence sources; information from law enforcement and open-source databases; analysis of trends and patterns associated with immigration violations; information provided by human sources, which may include confidential informants; previous encounters with aliens at a specific location; the geographical location in which the alien was observed or found; whether that location is known to

be frequented by illegal aliens seeking work; whether the location is known to be associated with specific businesses or employment engaged in criminal activity, including the smuggling, trafficking, or employment of illegal aliens; suspicious or evasive behavior of the individual observed prior to or during the encounter; a pattern or practice of suspicious or evasive behavior; any investigation or surveillance showing the above; and any other particularized facts based on agent observations justifying a detentive stop. An agent is permitted to analyze these factors and use their training and experience to make a rational inference to suspect that an individual has committed a criminal or immigration violation. Agents are trained to consider all these factors together rather than in isolation to evaluate the totality of the circumstances when determining whether reasonable suspicion exists.

9. The officers and agents assigned to this operation had significant field experience in developing reasonable suspicion based upon the totality of the circumstances and effectuating lawful detentive stops. Over time, they have developed specialized expertise and practical knowledge of the factors that are most indicative of immigration violations. Their understanding is informed by thousands of prior stops, arrests, interviews, and operations, as well as surveillance and intelligence reporting regarding migration flow. That experience and information enable agents to identify settings that are often associated with unlawful presence. For example, certain industries, such as construction, agriculture, street vendors, and car washing businesses, among others, that rely heavily on cash-paid day labor have historically attracted undocumented workers because one can earn a living without producing the required documentation to work lawfully in the United States. Thus, and as described above, agents know from past encounters that occupation is a critical consideration because it can be tied to known patterns of immigration violations.

10. The PI Order states that investigative detentions require reasonable suspicion based on an

individualized and particularized assessment—a standard our officers and agents already uphold. It also restricts reliance on the socioeconomic status of certain aliens, i.e. "working class" or "low income" individuals. While the PI Order qualifies that agents cannot rely "solely" on socioeconomic status in establishing reasonable suspicion, it implies that, when considered along with other information, their use is permissible. But it suggests that there will be special scrutiny on these factors that is not provided for other reasonable suspicion factors. Moreover, ambiguity remains despite the apparent definition of the term "working-class." The PI order fails to provide clear instructions and the terms "working class" and "low income" lack specificity making it impractical to implement and ensure compliance. It is particularly problematic given that many factors that agents routinely consider every day in thousands of operations are likely to fall within those broad and amorphous categories. It also does not delineate identifiable characteristics or attributes of an individual who would be considered "working class" or "low income." Such broad, imprecise categorizations make it difficult to train agents on how identify who qualifies as "low income" or "working class" versus individuals who fall outside these imprecise terms. This lack of clarity will also cause confusion among agents regarding what factors they can legally consider in analyzing reasonable suspicion and will cause agents to hesitate in taking legitimate enforcement actions for fear of inadvertently running afoul of the PI Order.

11. As mentioned above, in the context of immigration enforcement, certain occupations, like day laborers, have a consistently reliable association with unlawful immigration activity, making them highly probative indicators of such activity even when other factors are limited. Giving little or no weight to these factors contradicts the established method for developing reasonable suspicion, as it would force agents to ignore their training, experience, and common sense—an approach that is unworkable in real-world operational settings. Preventing agents from

appropriately considering these factors disregards decades of enforcement experience and hampers effective law enforcement, since factors that may appear insignificant in one context can be highly meaningful when evaluated within the broader investigative and operational framework.

12. The PI Order will also cause officers and agents to doubt their own judgment, training, and specialized experience, and lead to hesitation in the field. Hesitation in the field increases the danger CBP agents face in an already dangerous, fast-moving environment. Officers and agents working within this District have faced hostility, including violent crowds, assaults involving rocks, frozen bottles, Molotov cocktails, and even gunfire. In this volatile environment, officers and agents must make split-second decisions. Any delay or uncertainty about their legal authority compromises the effectiveness of the enforcement operation and can significantly increase the risk of harm to the officers, agents, and the public around them. Ultimately, the PI Order will undermine CBP's ability to conduct lawful enforcement operations effectively and safely.

13. Enjoining the ability to rely, in part, on a person's perceived Latino ethnicity is impractical to implement because it goes against the training on the "totality of the circumstances" that officers and agents are permitted to consider. Enjoining the ability to rely, in part, on a person's perceived Latino ethnicity is impractical to implement because it goes against the training on the "totality of the circumstances" that officers and agents are permitted to consider. The court does not define what it means by "Latino," or explain the distinction between perceived Latino ethnicity versus an individual's nationality as a factor in the reasonable suspicion analysis. This lack of clarity will create a chilling effect on officers' consideration of apparent nationality—a key element immigration officers' use in their calculation of whether an individual is potentially present in violation of immigration law.

14. Furthermore, the PI Order impermissibly chills enforcement and invites judicial

micromanagement of enforcement operations anytime there is a mix of prohibited and non-prohibited factors. Uncertainty over how the court might later view an agent's reliance on a mix of factors will cause hesitation and delay in the field, which in turn increases the risk of assaults on officers, escalations during volatile encounters, and injuries to both officers and the public, particularly in the already high-risk and unpredictable environment of Los Angeles. Although the agency has not yet been ordered to implement additional training and guidance for agents and officers on developing reasonable suspicion, the practical effect of this PI Order is that it will require the development of new training protocols that only apply to the Central District of California.

15. Additionally, the PI Order's requirement that the government can only detain individuals if they have "reasonable suspicion that the person to be stopped is within the United States in violation of immigration law" improperly limits the scope of CBP's law enforcement authority to immigration violations, ignoring the broad spectrum of federal laws that CBP enforces, particularly federal criminal law. This is especially relevant in those situations in which CBP engages in immigration enforcement activities and someone (regardless of citizenship) damages federal property or assaults a federal officer. The PI Order does not make clear whether "detentive stops" for crimes that arise from immigration enforcement activities are covered by the PI Order.

16. As written, this PI Order creates confusion, disrupts operations, and diverts resources from mission critical tasks. The vague terms and conditions make it difficult to assess CBP's compliance and could lead to hesitation by officers and agents, which risks their safety. These additional burdens on CBP's critical mission are especially concerning in the Central District of California, which is the largest district in the country with nearly 20 million people, 10% of which are estimated to be illegal aliens, making it one of the most important areas for immigration

Case: 26-7277, 11/03/2026, DktEntry: 5.1, (50 of 66)

enforcement in the country.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 28th day of October 2026.

Daniel I. Parra
Deputy Chief Patrol Agent
El Centro Sector

# EXHIBIT C

BRETT A. SHUMATE
Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
DANIEL F. MUMMOLO
Counsel to the Assistant Attorney General
AUGUST E. FLENTJE
Deputy Director
JONATHAN A. ROBBINS
Assistant Director
JASON K. ZUBATA
NANCY N. SAFAVI
ANIELLO DESIMONE
JACOB A. BASHYROV
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-3309
Email: august.flentje@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| PEDRO VASQUEZ PERDOMO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, *et al.*,<br><br>Defendants. | No. 2:25-cv-05605-MEMF-SP<br><br>**DECLARATION OF AUGUST E. FLENTJE IN SUPPORT OF DEFENDANTS' EX PARTE APPLICATION FOR STAY OF ORDER GRANTING PRELIMINARY INJUNCTION AND FOR STAY OF PROCEEDINGS PENDING APPEAL**<br><br>Hon. Maame Ewusi-Mensah Frimpong<br>United States District Judge<br><br>Referred to Hon. Sheri Pym<br>United States Magistrate Judge |

**DECLARATION OF AUGUST E. FLENTJE**

I, AUGUST E. FLENTJE, DECLARE pursuant to 28 U.S.C. § 1746 that:

1. I am the Deputy Director of the Office of Immigration Litigation (OIL), an office within the Civil Division of the United States Department of Justice. I joined the Civil Division of the Department of Justice in 1998 as a trial attorney, a career civil service position. I began serving as Deputy Director in 2024. In this role, I manage and consult on the various district court cases handled by OIL. My background, training, and experience have given me familiarity with and an understanding of various civil discovery processes, parameters, abilities, and limitations in a range of civil cases handled by OIL.
2. The principal responsibility of OIL is to litigate immigration cases originating in federal district courts (including appeals from those cases), as well as petitions for review of final orders of removal in federal appellate courts. Among many other cases filed across the country, OIL represents the Government in the above-captioned case.
3. I make this declaration in support of DEFENDANTS' EX PARTE APPLICATION FOR STAY OF ORDER GRANTING PRELIMINARY INJUNCTION AND FOR STAY OF PROCEEDINGS PENDING APPEAL. I make this declaration based on personal knowledge and review of records and information related to this case and the work of OIL.
4. Ongoing discovery in this matter has and continues to be extraordinarily burdensome and unique among cases I have been involved in 28 years at OIL and in the Civil Division. The discovery burden here is unique given that Plaintiffs are seeking discovery into every immigration arrest and stop by DHS in the Central District of California, and despite Defendants' concerns and requests to limit discovery in a proportional manner, this Court has generally agreed that this extraordinary discovery effort is warranted. *See* ECF 635 at 1 ("the Government has said that its agents are not unlawfully stopping people"; thus "[a]s part of the process of 'discovery,' the people and organizations who brought this lawsuit asked the Government to turn over the communications that the Government agents had regarding the operations" so as to "prove what the Government was saying was not true---the government did not have reasonable suspicion for *all of the stops*") (emphasis added). This is true in spite of there being serious questions regarding

Plaintiffs' standing to even bring this suit, as the Supreme Court has already stayed injunctive relief issued by this court based on, among other things, the Government's likelihood of prevailing on appeal. *See Noem v. Perdomo*, 146 S. Ct. 1, 1 (2025).

5. The scope of this discovery burden is extreme. While this case began with "limited, expedited" discovery, the Government's discovery obligations have been ongoing since October 2025. Discovery thus far has involved review of more than 4.3 million pages of documents. This review has been part of responding to over 230 particularized discovery requests for production and interrogatories in limited and plenary discovery. The review of this material has involved 306 document reviewers at the Department of Justice and impacted agencies, logging a total review time of over 13,000 hours and marking documents nearly 700,000 times. By way of comparison, if those reviewers charged fees comparable to the fees being sought by Plaintiffs in this case, *see* ECF 737-2, the bill would be between $7,700,000 (if all review was done by paralegals) and $22 million (if review was done by senior counsel). And this is just a portion of the ongoing discovery.

6. There are several cases filed around the country that raise claims very similar to those in *Perdomo*. Yet I am not aware of discovery in those cases being on a scale that comes close to the discovery authorized in *Perdomo*.

7. This review burden is also very complex given the law enforcement sensitivity of the materials at issue that are the subject of discovery. This review is further complicated by the nature of government organization and the equities of many agencies in the discovery documents. Somewhat unique to federal government litigation, multiple agencies have equities, resulting in multiple stages of review for many documents. This review is complicated by the fact that there are some non-party government components with equities in the discovery materials, which requires their additional review and thus significantly extends the time needed for review; for example, many documents have been sent to the Federal Bureau of Investigations for review given that they implicate that agency's privileges and equities.

8. To illustrate the significant burden, one of the 230 discovery requests is for body worn camera footage. UFW Set One. The Magistrate Judge ordered the production of roughly 4,700 videos by November 6, 2026. ECF 655. This is somewhat less than half of all such videos, not a targeted

sample. Given the potential exposure of sensitive information (including videos that show sensitive law enforcement databases), Defendants must spend countless hours reviewing and potentially redacting the videos. The work associated with reviewing and redacting thousands of videos is labor-intensive, technically complex, and requires the diversion of personnel from mission-critical duties.

9. The district court has also imposed unrealistic and onerous burdens to forensically image phones used by DHS officers – requiring in “limited expedited” discovery the imaging of every phone (including personal phones) possessed by hundreds of officers and agents who participated in one or more of fifteen immigration enforcement operations that took place over a year ago. This will inevitably produce millions of pages of documents to review, well beyond the number of documents reviewed to date. Each phone imaging and production process is very burdensome, and normally such an effort is carefully targeted to a few custodians centrally involved in the claim. It is not carefully targeted here – every phone must be forensically imaged under this Court’s order. Indeed, recognizing the extreme burden imposed by this order, Plaintiffs agreed to the production of three phones a week, a rate whereby it will take a period of years to satisfy the discovery ordered by the district court. Yet the district court ordered that this entire production be completed in two weeks.

10. For example, the volume from the first 23 forensically imaged phones took more than eight days to upload into the Department of Justice’s document review platform, which does not account for the time it took the Defendants ICE and CBP to process the phones. The reviewable files associated with just those 23 phones amounted to more than 170,000 documents, containing more than 454,000 pages of reviewable material. From the magistrate judge’s current court orders, there are potentially a thousand phones that could be implicated. Defendants anticipate more than 7 million documents to review in connection with all of the forensically imaged phones. Personal phones, which are likely to hold much more material due to use in the wide range of personal activities will require review of a significantly larger number of documents. That significantly larger amount of documents to be reviewed by government officials will implicate personal privacy and raise profound and far-reaching privacy concerns. This burdensome, intrusive, and

constitutionally suspect discovery will be largely irrelevant to the case at hand as the majority of the information on the personal phones will be wholly untethered to the case

11. The Court has also provided no clear guidance on how the government is expected to obtain agent's personal phones for imaging, but has held the government in contempt for not obtaining the personal phones and imposed an ongoing $500/day sanction. That sanction continues in spite of the government satisfying the contempt order by obtaining and imaging the limited number of personal phones that agents turned over voluntarily, ECF 635, and the lack of contemptuous conduct or a contempt finding with respect to the Court's recent order requiring that further steps be taken with respect to agents who did not turn over phones voluntarily. ECF 750; ECF 810.

12. It remains to be resolved how Plaintiffs and the district court will handle officer phones in plenary discovery, which involves a much larger number of operations and agents.

13. On May 7, 2026, Plaintiffs obtained permission (by way of stipulation) to expand the number of deposition requests to 20. ECF 501. Now, just a few months later, on October 22, 2026, Plaintiffs made a request to expand the number of depositions to 60. This is six times the number provided for by the Federal Rules of Civil Procedure. Fed. R. Civ. P. 30(a)(2)(A)(i). Their request to expand the number of permitted depositions appears to reflect an effort to search for evidence that has not surfaced through their extensive discovery to date. The burden of ongoing depositions, on top of various other discovery obligations, is substantial. Each deposition requires significant preparation time from government attorneys and the deponents, shifting them away from their assigned duties.

14. The attached declaration of Benjamin Moss (previously filed at ECF No. 214-1) further describes the litigation burdens imposed by what was intended to be "limited, expedited" discovery and the truncated and highly burdensome timelines imposed, along with recent (and ongoing) staffing impacts on OIL that have exacerbated the challenges in completing such burdensome discovery. Mr. Moss' declaration provides further context as to the burdens of imaging hundreds (if not thousands) of phones and explains in concrete terms what the process would entail, the multiple steps and personnel required to undertake and review such imaging, and how those demands must be considered against the government's current staffing constraints amid ongoing attrition, which

(as seen with discovery to date) have reduced the number of attorneys available to conduct document review and, consequently, prolonged the discovery process.

15. As Deputy Director, I manage a staff of five Assistant Directors and fewer than 60 trial attorneys dedicated to district court litigation of national importance that is filed throughout the country. By comparison, Plaintiffs listed 32 attorneys on the masthead of their most recent filing in this single case. ECF 815. For our office, this is one class action among many class actions and other significant litigations filed throughout the country. I have recently reviewed my case records that show over 60 major active district court litigations of national scope being handled primarily by OIL.

I DECLARE, under the penalty of perjury, that the foregoing is true and correct.

Executed on October 28, 2026

*/s/ August E. Flentje*
AUGUST E. FLENTJE
Deputy Director
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 514-3309
Email: august.flentje@usdoj.gov

# EXHIBIT D

BRETT A. SHUMATE
Assistant Attorney General
Civil Division
DREW C. ENSIGN
Deputy Assistant Attorney General
TIBERIUS DAVIS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
JONATHAN K. ROSS
Senior Litigation Counsel
STEPHANIE L. GROFF
JASON K. ZUBATA
ANIELLO DESIMONE
JACOB A. BASHYROV
Trial Attorneys
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-0919
Email: Jacob.Bashyrov@usdoj.gov

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
DANIEL A. BECK
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
ALEXANDER L. FARRELL (SBN 335008)
PAULINE H. ALARCON (SBN 345785)
Assistant United States Attorneys
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Tel: (213) 894-5557 | 3992
E-mail: Alexander.Farrell@usdoj.gov
Pauline.Alarcon@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

PEDRO VASQUEZ PERDOMO; *et al.*,

Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of Homeland Security; *et al.*,

Defendants.

No. 2:25-cv-05605-MEMF-SP

**DECLARATION OF BENJAMIN MARK MOSS IN SUPPORT OF DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S ORDER**

Hon. Maame Ewusi-Mensah Frimpong
United States District Judge

**JANJUARY 20, 2026 DECLARATION OF BENJAMIN MARK MOSS**

I, BENJAMIN MARK MOSS, DECLARE pursuant to 28 U.S.C. § 1746 that:

1. I incorporate my prior declaration, ECF No. 214-1 as if fully set forth herein.

2. I am the Acting Senior Counsel for District Court Litigation of the Office of Immigration Litigation ("OIL"), an office within the Civil Division of the United States Department of Justice. I joined the Civil Division of the Department of Justice in 2011 as a trial attorney, a career civil service position, within the Office of Immigration Litigation. Since then, in addition to handling cases in federal district and appellate courts, I have performed various management functions, including as a senior litigation counsel and an acting assistant director. In 2025, I was promoted to the position of Acting Senior Counsel for District Court Litigation. In this career federal civil servant role, I support and manage oversight of OIL's district court litigation. My direct supervisor is Acting Deputy Director Glenn Girdharry, also a career federal civil servant. My background, training, and experience have given me familiarity with and an understanding of various civil discovery processes, parameters, abilities, and limitations in a range of civil cases handled by OIL.

3. The principal responsibility of OIL is to litigate immigration cases originating in federal district courts (including appeals from those cases), as well as petitions for review of final orders of removal in federal appellate courts. OIL represents the Government in the above-captioned case.

4. I make this declaration in support of Defendants' objections to the Magistrate Judge's January 16, 2026 Order (ECF No. 370). The purpose of this declaration is to describe factually, based on my experience overseeing district court litigation and discovery across the Office of Immigration Litigation, why certain discovery measures combined with the timeline ordered are burdensome and inconsistent with customary discovery practices commonly employed in defensive civil litigation on behalf of the U.S. government. In particular, I explain why the Order requires discovery methods and timelines that are not reasonably achievable given the nature of the materials at issue, the number of custodians implicated, and the technical and legal constraints governing federal law-enforcement records. Because I make this declaration for a limited purpose as a summary of some of the steps involved with and challenges we face in completing compressed timelines for expedited discovery requests, I do not share

here all the information that is known to me about the subjects presented below, but rather, I present a summary and certain illustrative details.

5. I understand that the January 16, 2026 Order requires Defendants, among other things, to: (a) *collect and produce* "standardized documentation, including any targeting information or slide presentations given to agents" from the fifteen identified law-enforcement operations identified in FRP No. 2; (b) *identify* "all persons who were arrested during any of these operations [listed in RFP No. 2] and gather all documents concerning their arrests"; (c) *collect* "documents from every agent present at the operations listed in RFP No. 2, including any reports or notes they generated and any communications they exchanged relating to the operations"; (d) *produce* "all body worn camera footage recorded by any agent present" at any of the operations in RFP No. 2; (e) *forensically image* "any cell phone used by any agent present at any of the 15 operations" in FRP No. 2, and *review* those devices for materials responsive to RFP Nos. 2 and 3; and (f) *provide* "affidavits detailing [Defendants'] document collection processes." ECF No. 370 at 8-9. The Order further requires that the "majority" of this discovery be completed within a little over a week on January 23, with remaining production and affidavits due shortly thereafter on January 30. *Id.* at 9.

6. The order requiring that these tasks be completed on such a compressed timeline likely will require a staggering expenditure of time and resources and likely will require an undertaking which, given current resources, likely cannot be completed on that timeline. Based on my experience overseeing district court litigation, compressed timelines of the sort the Court identifies are unworkable: what ordinarily takes weeks and months cannot with existing OIL resources realistically be done in mere days. Indeed, even routine identification of potential custodians of responsive documents and subsequent collection of documents from those custodians requires the sustained attention of multiple personnel across DOJ and DHS components, diverting them from their other enforcement and litigation responsibilities. In my experience, the discovery measures ordered here combined with the timeline on which they have been ordered are extraordinary. In my experience, it is unusual to require forensic imaging of every custodial device, universal production of all data from the device of a custodian without allowing assessments of responsiveness, or affidavits detailing internal document collection processes

absent findings of bad faith, spoliation, or discovery misconduct. To my knowledge, no such findings were made here.

7. In completing document production following an Order such as the Court's January 16, 2026 Order, depending on the volume of materials involved it would take Defendants months or at a minimum several weeks to perform the following tasks before documents could be produced:

a. Identify document custodians and collection parameters.

b. Perform collections of ESI from those custodians.

c. Transmit necessary data to the Civil Division's Automation Litigation Support Lab ("the Lab"), which processes and loads data into Relativity document review software, referred to internally as "CORA." If data reaches the Lab without having been processed, it takes between one and three weeks to process it into a format that can be reviewed using Relativity.

d. Prepare search terms reports (also known as hit reports) to ensure that appropriate search terms are employed; and then, once the search terms are finalized, run a search of collected ESI to populate the subset of data to be manually reviewed for responsiveness and privilege.

e. Once pre-review data processing is complete, the data must be sorted into appropriate batches and passed on to a team of document reviewers for review.

f. Each batch of documents goes through several layers of review for responsiveness and, if responsive, privilege: first level (1L) and often second level (2L) review within the originating agency (here DHS, ICE, CBP, as well as their sub-components); then DOJ reviews; and in the event of a question about responsiveness or privilege, one or more additional rounds of interagency (IA) review is conducted until a final determination is made concerning whether a given document is responsive, and if so, whether any privilege applies.

g. In the event a document is responsive and privileged, care is taken to draft the privilege description that describes the basis for the privilege. It can routinely take 30 minutes or more to review a document, consult with a colleague to ask questions and prepare a privilege description.

h. When it is time to run a production of documents, all document reviewers are required to exit the Relativity software for a period of time to allow the assembly of a production search.

i. Running a production of documents will take the Lab somewhere between two and six hours, depending on various factors.

j. Once the Lab confirms that a run of documents is ready for production, it generally takes between two and five hours for the DOJ litigation team to conduct quality checks and secure mandatory consultation with leadership before making productions available.

k. For the document review steps summarized above to occur, document reviewers within the Defendant agencies and within the DOJ need to be identified, trained, and then assigned batches of documents for review. As noted above, reviewing documents for responsiveness and privilege is no small task; it can routinely take 30 minutes or more to review a single document.

l. Over the past eleven months, approximately 80 attorneys have departed from OIL. An order requiring expedited document discovery would require emergency efforts to rapidly identify and then train document reviewers. The departure of the approximately 80 attorneys has already increased the workload on the attorneys who remain at OIL, making the task of identifying trained personnel available to participate in document review extremely difficult.

Each of these steps is sequential, not parallel. Document discovery routinely takes months to complete under ordinary scheduling orders. Attempting to condense this process into a two-week discovery period would either result in incomplete or erroneous productions or require such a diversion of staff that other litigation and enforcement responsibilities would be neglected, and, frankly, it may not realistically be possible to complete document discovery in just two weeks. For these reasons, even with best efforts, it will not be feasible to provide the majority of the materials ordered to be produced by January 23, 206, or to produce the remaining materials by January 30, 2026, as the Court ordered. Even small custodial ESI collections routinely take several weeks to collect, process, review, and clear for production. Attempting to meet the Court's deadlines would almost certainly result in incomplete or erroneous productions.

8. For example, the requirement that Defendants forensically image any cell phone used by any agent present at any of the identified operations is particularly burdensome and atypical. Forensic imaging is a highly intrusive process that captures the entire contents of a device, potentially including (depending on the device and its contents) substantial volumes of personal, non-responsive, and privileged material. In my experience, such imaging is not ordered as a routine discovery measure but, rather, a proportionality analysis customarily is conducted. In my experience, requiring forensic device imaging from a number of custodians imposes substantial technical, legal, and privacy burdens.

9. Similarly, as I understand it, the Order's requirement that Defendants produce all body worn camera footage recorded by any agent present at any of the fifteen operations expands discovery beyond encounter-specific materials and into comprehensive operation-wide data. Locating, retrieving, reviewing, redacting, and producing such footage requires coordination with multiple field offices, secure evidence systems, and technical personnel, followed by time-intensive Privacy Act and privilege review. This process cannot be meaningfully expedited without substantial risk of error or improper disclosure. In addition, in my experience, it may be necessary to undertake one or more procurements to obtain software needed to conduct forensic imaging, adding to the time needed to complete that task. It is doubtful that reasonably available resources will allow these processes to occur within the one- to two-week period identified by the Court.

10. There is a protective order in this case, ECF No. 247. However, based on my experience, a protective order governs how information produced in a case may be shared or disclosed, but it generally does not convert privileged material into discoverable material or substitute for a responsiveness or privilege determination.

11. To the extent the Order requires collection from high-level officials at the Department of Homeland Security ("DHS"), this would require careful screening for responsiveness and any applicable privileges and time-consuming rounds of conferral with agency attorneys. In my experience, documents from high-level agency officials often implicate the deliberative-process privilege, law-enforcement privilege, or attorney-client and work-product protections. Even to the extent the Court orders documents from lower level agency employees, these documents may implicate privileges, such as the deliberative

process privilege and the attorney-client privilege, for instance. Determining whether to assert these privileges requires time-consuming consultation with agency counsel, sometimes at the Department-head level, and drafting privilege log entries that accurately describe the basis for asserting the privilege. This process cannot be accelerated without jeopardizing the integrity of privilege claims.

12. The requirement that Defendants provide affidavits detailing their document-collection processes further compounds the burden imposed by the Order. Preparing such affidavits requires (re)constructing and documenting complex, multi-agency discovery workflows while discovery is still ongoing. The requirement will also have the unintended side effect of slowing down production, is it will divert personnel from production so that they can spend time describing the production.

13. Although I have not seen the universe of documents that the Court ordered be produced by January 30, I predict based on prior cases that a substantial number of the documents collected in response to the Order, once reviewed, will be deemed either non-responsive or privileged, resulting in an enormous expenditure of time with comparatively few documents to produce. For instance, the Court's order requires the collection "standardized documentation," ECF No. 370 at 8, but it is unclear what that phrase means. To the extent the Order contemplates targeting packages, slides, arrest documentation, reports, notes, body camera footage, and other communications, based on my experience, such documents may be highly sensitive, in many cases privileged, and review likely will require extensive coordination across multiple Defendant (sub)agencies. Complying with the Order as written would require the rapid redeployment of substantial Department of Justice and technical resources away from other pressing litigation and enforcement matters, and it is uncertain whether it will be feasible to make such a reallocation within the extremely short time contemplated by the Order.

14. Although I have not seen the universe of documents that the Court ordered be produced by January 30, I understand that requests for stop-level records such as body worn camera footage, Field Operations Worksheets, or contemporaneous notes are especially burdensome. Locating and retrieving such materials requires coordination across field offices, pulling data from secure evidence systems, and often imaging and review by IT staff. All such records must then undergo Privacy Act and privilege review before production.

15. The Court's discovery schedule requires OIL to attempt to mobilize dozens of attorneys to work nights and weekends, setting aside their other assigned cases. Based on my litigation oversight role, depending on the volume of data that is ultimately collected and needs to be reviewed, I estimate expedited discovery of the scope the Court ordered could consume thousands of attorney hours, producing only a small fraction of responsive, non-privileged documents. That resource drain would prejudice the government's ability to handle other litigation and enforcement matters.

16. In my capacity as Acting Senior Counsel, I confirm that DOJ and DHS have issued litigation holds that preserve potentially relevant materials. Those litigation holds are regularly retransmitted to the agencies. Those litigation holds are designed to ensure no relevant material is lost during the pendency of this litigation.

I DECLARE, under the penalty of perjury, that the foregoing is true and correct.

Executed on January 20, 2026

*<u>/s/ Benjamin Mark Moss</u>*
BENJAMIN MARK MOSS
Acting Senior Counsel for District Court Litigation
Office of Immigration Litigation
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-8675
Email: benjamin.m.moss2@usdoj.gov