**No. 26-7277**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

PEDRO VASQUEZ PERDOMO, et al.,
Plaintiffs-Appellees,

v.

RODNEY S. SCOTT, et al.,
Defendants-Appellants.

On Appeal from the United States District Court
for the Central District of California
No. 2:25-cv-5605-MEMF-SP

# BRIEF FOR APPELLANTS

JONATHAN GUYNN
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney General*

AUGUST FLENTJE
*Deputy Director*
*Office of Immigration Litigation*

JONATHAN ROBBINS
*Assistant Director*
*Office of Immigration Litigation*

NANCY SAFAVI
JACOB BASHYROV
STEPHANIE L. GROFF
JASON K. ZUBATA
JENNIFER ROSARIO
AMOS NAM
*Trial Attorneys*
*Office of Immigration Litigation*
*Civil Division*
*U.S. Department of Justice*
*P.O. Box 878*
*Ben Franklin Station*
*Washington, DC 20044*
*Tel: (202) 305-8275*

*Attorneys for Defendants-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument in this appeal. This case involves exceptionally important questions about the Department of Homeland Security's authority and obligations to conduct immigration stops based on reasonable suspicion, a critical enforcement tool currently under review in multiple courts of appeals. This appeal also raises issues previously before the Supreme Court that this Court has not since had occasion to reconsider. The government accordingly believes that oral argument will materially aid the Court in resolving this appeal.

## STATEMENT REGARDING CIRCUIT RULE 34-3

The government respectfully submits that this case is entitled to priority in hearing date under Circuit Rule 34-3(3), as it involves the entry of a preliminary injunction.

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………........1

STATEMENT OF JURISDICTION……………………………………………………...5

STATEMENT OF THE ISSUES………………………………………………………6

STATEMENT OF THE CASE…………………………………………………………...6

A. Legal Background……………………………………………………………...6

B. Factual Background……………………………………………………………8

C. Procedural Background…………………………………………………………10

SUMMARY OF ARGUMENT…………………………………………………………..13

STANDARD OF REVIEW……………………………………………………………...15

ARGUMENT……………………………………………………………………………15

I. PLAINTIFFS LACK ARTICLE III STANDING TO SEEK PROSPECTIVE RELIEF …………………………………………………………………………..16

A. Plaintiffs Must Demonstrate A Real And Immediate Threat Of Future Injury…………………………………………………………………………16

B. The Individual Plaintiffs Failed To Demonstrate A Real And Immediate Threat Of Future Injury………………………………………………………18

C. Plaintiffs Also Cannot Establish Traceability Or Redressability…………23

D. Plaintiffs Cannot Avoid The Standing Defect By Changing Labels………23

E. The Organizational Plaintiffs And Intervenors Also Lack Standing…..…26

F. The INA Independently Bars Plaintiffs' Claims…………………………27

II. THE DISTRICT COURT ERRED IN CERTIFYING THE STOPS CLASSES……………………………………………………..……….28

A. The Class Members Lack Article III Standing…………………………...28

B. The Classes Do Not Satisfy Rule 23(a)……………………………………..29

C. The Classes Fail Rule 23(b)…………………………………………………33

III. THE DISTRICT COURT MISAPPLIED THE FOURTH AMENDMENT AND EQUAL-PROTECTION PRINCIPLE………...34

A. The Injunction Conflicts With Fundamental Fourth Amendment Principles ……………………………………………………………………..34

B. There Is No Equal-Protection Violation………………………………….42

IV. THE REMAINING FACTORS DISFAVOR PRELIMINARY RELIEF ………………………………………………………………..45

A. Plaintiffs Do Not Face Irreparable Harm Without The Injunction……45

B. The Balance Of Equities Tip Decisively In The Government's Favor...47

V. THE INJUNCTION EXCEEDS THE LIMITS OF EQUITABLE RELIEF………………………………………………………………....50

A. The District Court Issued An Impermissible Follow-The-Law Injunction.50

B. The District Court Entered A Non-Party-Specific Injunction……………52

CONCLUSION……………………………………………………………………..54

ADDENDUM…………………………………………………………………………1a

# TABLE OF AUTHORITIES

## CASES

*Abel* v. *United States*,
362 U.S. 217 (1960) .......... 6

*Alderman v. United States*,
394 U.S. 165 (1969) .......... 28

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 48

*Ballas v. Anthem Blue Cross Life & Health Ins. Co.*,
2013 WL 12119569 (C.D. Cal. Apr. 29, 2013) .......... 34

*Barrera v. DHS*, No.,
07-3879, 2009 WL 825787 (D. Minn. Mar. 27, 2009) .......... 38

*Black Lives Matter L.A. v. City of L.A.*,
113 F.4th 1249 (9th Cir. 2024) .......... 31, 32

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) .......... 46

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......... 3, 16, 17, 18, 19, 21, 22, 26, 29, 46, 47

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013).. .......... 17, 19, 26, 27, 29

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 43

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 29

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) .......... 4, 44

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) .......... 25

*East Tex. Motor Freight System, Inc. v. Rodriguez*,
431 U.S. 395 (1977) .......... 33

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 28

*Florida v. Bostick*,
501 U.S. 429 (1991) .......... 41

*Fraihat v. ICE*,
16 F.4th 613 (9th Cir. 2021) .......... 6, 29

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) .......... 30, 33

*Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*,
446 U.S. 318 (1980) .......... 30

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .......... 30

*Harlow* v. *Fitzgerald*,
457 U.S. 800 (1982) .......... 49

*Hernandez v. City of San Jose*,
897 F.3d 1125 (9th Cir. 2018) .......... 29

*Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*,
542 U.S. 177 (2004) .......... 41

*Hodgers-Durgin v. de la Vina*,
199 F.3d 1037 (9th Cir. 1999) .......... 23

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 27

*Hussen v. Noem*,
822 F.Supp.3d 944 (D. Minn. March 9, 2026) .......... 22

*Illinois v. Wardlow*,
528 U.S. 119 (2000) ........................................ 43

*J.D. v. Azar*,
925 F.3d 1291 (D.C. Cir. 2019) ........................................ 34

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ........................................ 48

*Kamar v. RadioShack Corp.*,
375 F. App'x 734 (9th Cir. 2010) ........................................ 34

*L.A. All. for Hum. Rts. v. Cnty. of Los Angeles*,
14 F.4th 947 (9th Cir. 2021) ........................................ 15

*Lewis v. Nat'l Football League*,
146 F.R.D. 5 (D.D.C. 1992) ........................................ 34

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................ 16, 23

*Maldonado v. Holder*,
763 F.3d 155 (2d Cir. 2014) ........................................ 42

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ........................................ 28

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ........................................ 25, 26

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ........................................ 34

*Muehler v. Mena*,
544 U.S. 93 (2005) ........................................ 50

*Mullin v. Doe*,
2026 WL 1825840 (2026) ........................................ 45

*Munyon v. Henson*,
2010 WL 480881 (C.D. Ill. Feb. 2, 2010) .......... 38

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 16

*Nguyen Da Yen v. Kissinger*,
70 F.R.D. 656 (N.D. Cal. 1976) .......... 31

*Nielsen v. Preap*,
586 U.S. 392 (2019) .......... 7

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 16, 48

*Noem v. Vasquez Perdomo*,
146 S.Ct. 1 (2025) .......... 1

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .......... 15

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .......... 23, 29

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) .......... 34

*Rakas v. Illinois*,
439 U.S. 128 (1978) .......... 28

*San Antonio Independent School Dist. v. Rodriguez*,
411 U.S. 1 (1973) .......... 44

*Sanchez v. Sessions*,
904 F.3d 643 (9th Cir. 2018) .......... 50

*Schmidt v. Lessard*,
414 U.S. 473 (1974) .......... 51

*Schwartz v. Upper Deck Co.*,
183 F.R.D. 672 (S.D. Cal. 1999) .......... 31

*Terry* v. *Ohio*,
392 U.S. 1 (1968) ........................................................................................................7

*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025) ....................................................................................36, 53

*Thorpe v. District of Columbia*,
303 F.R.D. 120 (D.D.C. 2014) ....................................................................................... 35

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................................................................................................... 29

*Trump v. Boyle*,
145 S.Ct. 2653 (2025)......................................................................................................2

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ...................................................................................... 5, 48, 53, 54

*Trump v. Hawaii*,
585 U.S. 667 (2018) ....................................................................................................... 44

*United Farmworkers of America v. Mullin*,
No. 25-4047, 2026 U.S. App. LEXIS 25727 (9th Cir. Aug. 24, 2026)................................. 18

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996) ....................................................................................................... 27

*United States v. Arvizu*,
534 U.S. 266 (2002) ................................................................................................35, 42

*United States v. Banks*,
540 U.S. 31 (2003) ......................................................................................................... 42

*United States* v. *Brignoni-Ponce*,
422 U.S. 873 (1975) ..........................................................7, 29, 34, 39, 41, 42, 43, 47

*United States v. Mendenhall*,
446 U.S. 544 (1980) ....................................................................................................... 40

*United States v. Sokolow*,
490 U.S. 1 (1989) ........................................................................................................ 2, 42

*United States v. Texas*,
599 U.S. 670 (2023) ..................................................................................................... 24, 28

*United States v. Washington*,
853 F.3d 946 (9th Cir. 2017) ........................................................................................ 15

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ..................................................................................................... 45

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .............................................................................. 31, 32, 33, 34

*Whren v. United States*,
517 U.S. 806 (1996) ..................................................................................................... 44

*Winter v. NRDC*,
555 U.S. 7 (2008) ........................................................................................... 16, 46, 47

## STATUTES

Immigration and Nationality Act of 1952, as amended:

Section 101,
8 U.S.C. § 1101 ......................................................................................................................6

Section 242(g),
8 U.S.C. § 1252(g) ........................................................................................................ 28

Section 287(a),
8 U.S.C. § 1357(a) ..........................................................................................................7

Section 287(a)(1),
8 U.S.C. § 1357(a)(1) .....................................................................................................7

Section 287(a)(2),
8 U.S.C. § 1357(a)(2) .....................................................................................................7

## OTHER STATUTES

28 U.S.C. § 1292(a)(1) .......... 6, 29

28 U.S.C. § 1331 .......... 6

## REGULATIONS

8 C.F.R. § 287.1(g) .......... 8

8 C.F.R. § 287.5(a) .......... 7

8 C.F.R. § 287.5(c) .......... 7

8 C.F.R. § 287.8(b)(2) .......... 7, 49

# INTRODUCTION

This appeal presents a familiar dispute over the core authority of the Department of Homeland Security (DHS) to conduct brief immigration stops. Roughly a year ago, the district court entered an extraordinary injunction barring immigration officers from relying on four cobbled-together factors—apparent race or ethnicity, speaking Spanish or speaking English with an accent, presence at a particular location, and occupation—in developing reasonable suspicion for those stops. The Supreme Court intervened and stayed that injunction. *Noem v. Vasquez Perdomo*, 146 S.Ct. 1, 2 (2025).

History now repeats. The district court has granted a substantially similar injunction, collapsing four facts into two. Specifically, it prohibited officers from relying solely on "apparent status as low-income or working-class and Latino" to conduct stops. 1-ER-129. That injunction is just as flawed as the one stayed by the Supreme Court (if not more so) and irreparably harms the enforcement of federal immigration law in the Central District of California—a principal destination for illegal aliens, with approximately 1.92 million residing among the District's nearly 20 million total inhabitants.

Reasonable suspicion is context-dependent and cannot be reduced to per se rules, and the district court erred here in imposing such rules. No one thinks that appearing "working-class and Latino" (assuming *arguendo* those categories carry a meaning readily discernible to officers) *always* creates reasonable suspicion for a stop. Nor does anyone suggest those are the *only* factors federal agents ever consider. But in many situations, such factors—considered as

part of the totality of the circumstances—can heighten the likelihood that someone is unlawfully present in the United States, above and beyond the 1-in-10 baseline odds in the Central District of California. Immigration officers are therefore entitled to rely on those factors when enforcing immigration laws, and courts may not impose categorical rules restricting the totality-of-the-circumstances inquiry for reasonable suspicion, a "level of suspicion" that involves "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). And here, those circumstances include that: (i) about 1 in every 10 people in the District is present illegally; (ii) many locations unlawfully employ illegal aliens and are known to hire them on a day-to-day basis; (iii) certain types of jobs—like day labor, landscaping, or construction—are most attractive to illegal aliens because they often do not require paperwork; (iv) the vast majority of illegal aliens in the District hail from Mexico or Central America; and (v) many speak only Spanish.

Plaintiffs—a group of individuals and immigrant-advocacy groups—satisfy none of the prerequisites for a preliminary injunction. The Supreme Court, in granting a stay of the materially similar injunction at an earlier stage of this case, firmly rejected the district court's attempt to cabin the reasonable-suspicion inquiry and forbid any combination of the aforementioned four factors, in isolation or together, to ever amount to reasonable suspicion. *Perdomo*, 146 S.Ct. at 1. That interim order must "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S.Ct. 2653, 2654 (2025). Rather than give any genuine effect to the Supreme Court's stay order, the district court invoked a decision by a motions panel of this Court denying the very stay that the Supreme Court subsequently

granted. In essence, the district court relied on a decision that was subsequently and effectively reversed and pretended that subsequent history did not exist. The district court's approach defies *Boyle* and flouts elementary principles of vertical *stare decisis*.

*Boyle* aside, Plaintiffs continue to lack Article III standing for prospective injunctive relief. Indeed, standing is less likely to be established here, because it is even more speculative that any particular person will be stopped based exclusively on the two factors prohibited by the district court. Even assuming that individual Plaintiffs were stopped previously without reasonable suspicion, allegations of past, unlawful interactions with law enforcement do not show a "real and immediate threat" of *future* unlawful interactions. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Just because Plaintiffs were detained in the past does not mean that they, out of the Central District's 20 million people, will be detained again, let alone detained without reasonable suspicion. The same failure to establish a certainly impending future injury also defeats traceability and redressability.

Plaintiffs cannot cure that jurisdictional defect by invoking the alleged injuries of a few immigrant-advocacy organizations. Just like the individual Plaintiffs in this case, any risk of future harm for the organizations' members is speculative; even if it were not, it is well-established that Fourth or Fifth Amendment rights cannot be vicariously asserted. Additionally, the Immigration and Nationality Act (INA) independently bars Plaintiffs' claims.

Plaintiffs' claims likewise fail on their own terms. Immigration officers had reasonable suspicion—based on a targeted, context-specific inquiry—to believe that Plaintiffs were in the United States illegally; the stops were thus lawful. Read in context, the record evidence

demonstrates that the challenged stops rested on factors other than, or in addition to, race. Enjoining immigration officers from relying on certain factors like ethnicity, location, or occupation sharply departs from settled law requiring immigration officials to consider the totality of the circumstances. Nor have Plaintiffs articulated any basis for their Fifth Amendment claim that they were unlawfully targeted based on race alone. At root, Plaintiffs raise a type of disparate-impact claim that the Supreme Court has squarely rejected. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34 (2020). There is also no final agency action implicated in this case.

Intertwined with the district court's flawed merits analysis was its certification of two classes. Challenges to immigration stops turn on the particular circumstances of each arrest, which are intensely fact-bound. Those individualized inquiries defeat numerosity, commonality, typicality, and the requirement that a single injunction provide relief to the class as a whole. *See* Fed. R. Civ. P. 23(a), (b)(2).

The remaining factors also disfavor preliminary relief. Without Article III standing, Plaintiffs are not entitled to prospective relief. Plaintiffs therefore cannot establish the irreparable harm necessary to justify an injunction. And even assuming standing, Plaintiffs have failed to make a clear showing that they are likely to be stopped without reasonable suspicion in the future. This injunction also inflicts obvious irreparable harm on the government. Not only does the injunction wrongly brand countless lawful stops as unconstitutional, thereby hampering a basic law-enforcement tool, but it also turns every stop in the district into a potential contempt trap. No agent can confidently enforce the law and

engage in routine stops when the district court may later refuse to credit that the stop reflected additional, permissible factors and instead treat countless stops as sanctions-triggering misconduct. That threat "will inevitably chill lawful immigration enforcement efforts." *Perdomo*, 146 S.Ct. at 4 (Kavanaugh, J., concurring).

Even so, the injunction itself defies black-letter Fourth Amendment law, imposing a straitjacket on law-enforcement efforts that is inimical to the context- and case-specific totality-of-the-circumstances inquiry that Supreme Court precedent demands. And rather than limiting relief to Plaintiffs, the district court imposed a non-party-specific, District-wide injunction applicable to millions of people, which is at odds with the Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025).

Absent this Court's intervention, the district court will micromanage immigration stops throughout the Central District, at the expense of the Executive Branch's enforcement priorities and the separation of powers. This Court should accordingly reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction to review a preliminary injunction under 28 U.S.C. § 1292(a)(1). The government filed a timely notice of appeal. 5-ER-822; 5-ER-829.

This Court may also review district court's order certifying the Suspicionless Stops Class and the First Discriminatory Treatment Class, which is inextricably intertwined with the preliminary injunction and rests on the same legal determinations challenged in this appeal. *Fraihat v. ICE*, 16 F.4th 613, 635 (9th Cir. 2021).

## STATEMENT OF THE ISSUES

1. Whether the district court improperly granted a preliminary injunction that prospectively regulates how federal immigration officers conduct detentive stops in the Central District of California.

2. Whether the district court erred in certifying the Suspicionless Stops Class and First Discriminatory Treatment Class.

## STATEMENT OF THE CASE

### A. Legal Background

The Immigration and Nationality Act, ch. 477, 66 Stat. 163 (8 U.S.C. § 1101 *et seq.*), consistent with statutes enacted throughout the Nation's history, authorizes immigration officers to search for and apprehend illegal aliens to facilitate their removal from the United States. *See Abel* v. *United States*, 362 U.S. 217, 233 (1960) (collecting statutes "authoriz[ing] the arrest of deportable aliens by order of an executive official"); *see also*, *e.g.*, Act of June 25, 1798, ch. 58, § 2, 1 Stat. 571 (authorizing the President to "cause to be arrested and sent out of the United States such of those aliens as shall have been ordered to depart therefrom"). The Act authorizes officers to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and arrest any alien if they have "reason to believe that the alien ... is in the United States in violation of [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. §§ 1357(a)(1) and (2); *see Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019) (noting statutes vesting immigration enforcement

powers in Secretary of Homeland Security); *see also* 8 C.F.R. §§ 287.5(a) and (c) (authorizing immigration officers to interrogate and arrest aliens).

Immigration officers can exercise those powers "without [a] warrant." 8 U.S.C. § 1357(a). And they can detain individuals for questioning based on "reasonable suspicion" of illegal presence in the United States. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion requires "aware[ness] of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the person is an "alien[] who may be illegally in the country." *Brignoni-Ponce*, 422 U.S. at 884. The reasonable-suspicion inquiry "turn[s] on the totality of the particular circumstances." *Id.* at 885 n.10.

Such investigative stops have been a critical component of day-to-day federal immigration enforcement efforts for decades, across administrations. Federal regulations implementing the INA expressly contemplate such stops and codify the reasonable-suspicion requirement. 8 C.F.R. § 287.8(b)(2). Immigration and Customs Enforcement (ICE) guidance for immigration officers likewise describes investigatory stops supported by reasonable suspicion as one of the "principal levels of encounters" that agents initiate in enforcing the immigration laws. ICE, *Search and Seizure Handbook* 16 (2012), https://tinyurl.com/3b4z335x. Immigration officers receive training on what reasonable suspicion entails and are taught to form reasonable suspicion based on the totality of the circumstances rather than any particular facts or considerations in isolation. *See* 2-ER-164-165; 8 C.F.R. § 287.1(g); *Search and Seizure Handbook* 11.

### B. Factual Background

**1.** Based on recent census and Office of Homeland Security Statistics data, the government estimates that at least 15 million illegal aliens—and likely several million more—are unlawfully present in the United States.[1] Millions crossed into the country illegally within the last four years. From 2021 to 2024, federal agents encountered some 9 million illegal aliens along the border; many more illegally entered after evading detection entirely. *See* Dep't of Homeland Sec., Office of Homeland Sec. Statistics, *Immigration Enforcement and Legal Processes Monthly Tables* (2025), https://tinyurl.com/2kw6p3p210. By current estimates, some 12.8 million aliens entered the country illegally during the previous administration. "About 10 percent of the people in the Los Angeles region are illegally in the United States—meaning about 2 million illegal immigrants out of a total population of 20 million." *Perdomo*, 140 S.Ct at 1.

In June 2025, ICE and Customs and Border Protection (CBP) increased immigration enforcement in the greater Los Angeles area through two related operations. Operation At Large was a nationwide effort that prioritized the arrest of individuals without lawful status who were subject to executable final orders of removal. 2-ER-185-86. On June 6, CBP deployed personnel to Los Angeles to support ICE's operations. As part of the related

[1] See also Steven A. Camarota & Karen Zeigler, Ctr. for Immig. Studies, *Foreign-Born Number and Share of U.S. Population at All-Time Highs in January 2025* (2025) (estimate of 15.4 million as of January 2025), https://tinyurl.com/mv6ktpn9; Bryan Baker & Robert Warren, Dep't of Homeland Sec., Office of Homeland Sec. Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018-January 2022* (2024) (estimate of 11 million as of January 2022), https://tinyurl.com/yc6e44ty.

Operation At Large Los Angeles, Border Patrol agents also conducted their own immigration enforcement operations and helped protect federal buildings and property. 2-ER-186. CBP typically deployed teams of three to five agents who approached individuals on streets and sidewalks, in parking lots, and in publicly accessible areas of businesses, including car washes. Border Patrol's participation in Operation at Large ended in February 2026, although immigration enforcement continued in the district. 2-ER-171-72; 1-ER-110.

**2.** This case began on June 20, 2025 when three illegal aliens (Perdomo, Osorto, and Molina) who were arrested in the Los Angeles area filed a habeas corpus action in the Central District seeking their release from immigration detention. 4-ER-814-20. These three individual Plaintiffs work as day laborers; they were arrested in Pasadena on June 18, 2025, in connection with "a targeted enforcement action at a particular location" (a doughnut shop) "where past surveillance and intelligence had confirmed that the target or individuals associated with him were observed to have recruited illegal aliens to work on landscaping jobs." 4-ER-614. (All three have since been released from immigration detention on bond. 1-ER-59-60.) A fourth Plaintiff (Hernandez Viramontes) alleges that agents came to the car wash where he works on four occasions in June, and on one of those occasions briefly detained him before verifying his citizenship. 4-ER-789-90; 4-ER-740-41. A fifth Plaintiff (Gavidia), a United States citizen, says agents once seized him at a tow yard and asked about his citizenship status. 4- ER-791-92; 4-ER-742-48.

The three organizational Plaintiffs relevant to this claim are Los Angeles Worker Center Network, United Farm Workers, and Coalition for Humane Immigrant Rights. They generally

allege that their members have been detained and fear that immigration agents will detain them again. 4-ER-794-96; 4-ER-798.

### C. Procedural Background

This appeal arises from Plaintiffs' attempt to transform a series of immigration enforcement encounters during (the now demobilized) Operation At Large Los Angeles into a challenge to all future lawful immigration enforcement operations.[2] On June 6, 2025, Defendants began Operation At Large Los Angeles ("OAL"), in which CBP agents and officers were deployed into the region to support ICE with enforcement of immigration laws. *See* 3-ER-426.

On July 2, 2025, Plaintiffs filed their operative complaint, which sought to transform simple habeas claims into a sweeping request for a district-wide injunction enjoining the government's alleged "ongoing pattern and practice of flouting the Constitution and federal law in connection with ongoing immigration raids in the Los Angeles area." 4-ER-752. On July 11, 2025, the Court issued a temporary restraining order ("TRO"), prohibiting all immigration stops based on four enumerated factors alone or in combination: race, language, location, or occupation. 4-ER-722. The government appealed and sought stays in district court and this Court; both motions were denied. 4-ER-620; 4-ER-592; 3-ER-569-78; 3-ER-567-68.

[2] Enforcement in the Central District remains a high priority despite the demobilization.

On September 8, 2025, the Supreme Court stayed the TRO pending appeal. *Perdomo*, 146 S.Ct. at 1. Justice Kavanaugh concurred, explaining that Plaintiffs "likely lacked Article III standing to seek a broad injunction restricting immigration officers from making these investigative stops," and "[s]econd, even if plaintiffs had standing, the Government has a fair prospect of succeeding on the Fourth Amendment issue" on the merits. *Id.* at 1-3 (citations omitted).

The Supreme Court's stay did not end Plaintiffs' effort to obtain district-wide relief. Plaintiffs returned to the district court with additional declarations and evidence of past encounters and renewed their request for district-wide relief. Plaintiffs moved for a preliminary injunction alleging that the government maintained an ongoing policy and practice of conducting discriminatory and suspicionless investigatory stops. 3-ER-303-42. Plaintiffs also moved to certify two classes under Federal Rule of Civil Procedure 23(b)(2), the Suspicionless Stops Class and the First Discriminatory Treatment Class, relying on substantially the same allegations and evidentiary record advanced in support of injunctive relief. 2-ER-272; 1-ER-45.

The district court granted Plaintiffs' request for a preliminary injunction. 1-ER-47-130; 1-ER-2-46. The district court allowed the Intervenors to participate in the request for injunctive relief. 1-ER-129. From a handful of isolated encounters, the district court found the government maintained a district-wide "Racially Based Stops Policy" and that such policy likely violates the Fourth and Fifth Amendments. 1-ER-96-103. In finding the alleged policy was officially sanctioned, the district court relied on this Court's motions panel for the

proposition that Plaintiffs could establish such a practice through testimony about their encounters even without an express government directive while ignoring that the Supreme Court had effectively reversed by granting the very stay that the cited opinion denied. 1-ER-94-95.

The injunction bars Defendants from enforcing what the court identified as a policy of conducting detentive stops in the District based on "racial stereotyping" in place of a "pre-stop individualized, particularized assessment" of reasonable suspicion that the person is unlawfully present in the United States. 1-ER-129. It excepts stops at ports of entry, checkpoints, and other functional equivalents of the border. 1-ER-129. In assessing reasonable suspicion, an officer must consider all the circumstances and "may not rely solely on apparent status as low-income or working-class and Latino," even when an identified target is described as sharing both characteristics. 1-ER-129. The court denied without prejudice Plaintiffs' request to require Defendants to document every field encounter and provide those records to Plaintiffs every 30 days. 1-ER-124-26.

In addition to issuing a preliminary injunction, the district court certified two classes with the following definitions:

> **First Discriminatory Treatment Class:** All persons who, since June 6, 2025, have been or will be subjected to a detentive stop in this District by federal agents or officers at least in part because of their apparent Latino race, color, and/or ethnicity, other than at a port of entry, checkpoint, or other functional equivalent of the border, or in connection with a known target description if there are other objective bases to believe that the individual is the target.

> **Suspicionless Stops Class:** All persons who, since June 6, 2025, have been or will be subjected to a detentive stop in this District by federal agents or officers for purposes of immigration enforcement, other than at a point of entry, checkpoint, or other functional equivalent of the border, based on their apparent status as both low-income (or working-class) and Latino.

1-ER-45. The government timely appealed both orders. 5-ER-829-30.

After the district court issued the injunction, Defendants sought a stay of the preliminary injunction pending appeal and a stay of further proceedings before the district court. 2-ER-140. The district court denied both requests. 2-ER-132-37. Defendants then sought those stays pending appeal in this Court. 9th Cir. Dkt. No. 5. On November 6, 2026, this Court temporarily administratively stayed the preliminary injunction pending consideration of Defendants' emergency stay motion. 9th Cir. Dkt. No. 11. On November 13, 2026, the Court extended the administrative stay through fourteen days after issuance of its decision in this appeal (as requested by the parties), and withdrew the stay motion without prejudice. 9th Cir. Dkt. No. 17.

## SUMMARY OF ARGUMENT

**I.** This Court should reverse the preliminary injunction. The injunction rests on a standing theory that the Supreme Court has repeatedly rejected. Plaintiffs sought sweeping prospective relief governing all immigration enforcement operations in the District but never established a real and immediate threat of a future stop—much less a stop without reasonable suspicion. Instead, they relied on past, isolated encounters, speculative fear, and an alleged *unwritten* enforcement policy that defies *written* agency policy and practice. Operation At Large

has long since demobilized, rendering Plaintiffs' claims moot, and Plaintiffs are even less likely to face future injury given that it is more speculative they will be stopped based exclusively on the two factors prohibited by the district court. The INA independently bars Plaintiffs' claims.

**II.** The district court likewise erred in certifying the proposed classes. Rule 23 cannot cure a standing defect. But even putting standing aside, the classes fail under both Rule 23(a) and (b), because the elements of numerosity, commonality, and typicality are not satisfied, the classes is are improper fail-safe classes, and they are not ascertainable.

**III.** The district court also erred in concluding Plaintiffs demonstrated a likelihood of success on their constitutional claims. The district court departed from settled reasonable-suspicion principles and failed to apply the fact-specific inquiry that governs investigatory stops under the Fourth Amendment. The equal-protection theory adopted below similarly lacks merit and fails to establish a constitutional violation.

**IV.** Even apart from standing and the merits, Plaintiffs failed to satisfy the remaining requirements for preliminary relief. The record does not support a likelihood of irreparable injury, and the balance of equities and public interest tip decisively in the government's favor.

**V.** Finally, the injunction exceeds the proper limits of equitable relief. Its operative restrictions invite ongoing judicial supervision of future immigration enforcement operations and sweep more broadly than necessary to remedy any injury properly before the court. The district court's vague, class-based standards also fail to supply the requisite clarity that Rule 65 demands for injunctions. To the extent that its nebulous terms are enforceable at all, the injunction entered below is—once again—an impermissible follow-the-law injunction.

## STANDARD OF REVIEW

This Court reviews a preliminary injunction under three standards: factual findings for clear error, legal conclusions *de novo*, and the scope of the injunction for abuse of discretion. *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017).

This Court reviews a class-certification order for abuse of discretion. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc). Questions of law underlying both the preliminary injunction and class-certification order, including Article III standing, the district court's jurisdiction, and the requirements of Rule 23, are reviewed *de novo*. *L.A. All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021).

## ARGUMENT

To obtain a preliminary injunction, the movant must show: (i) a substantial likelihood of success on the merits; (ii) irreparable harm in the absence of the injunction; (iii) that the balance of equities tips in favor of the movant; and (iv) that the injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The district court entered a sweeping preliminary injunction that subjects immigration enforcement throughout the Central District of California to ongoing judicial management and satisfies none of the requirements for prospective equitable relief. The district court

further erred in granting class certification and issuing an injunction that extends far beyond Plaintiffs' alleged injuries.

## I. PLAINTIFFS LACK ARTICLE III STANDING TO SEEK PROSPECTIVE RELIEF

### A. Plaintiffs Must Demonstrate A Real And Immediate Threat Of Future Injury

The district court's injunction rests on a premise that Article III forbids: that a plaintiff who alleges a past injury may obtain sweeping prospective relief without showing a real and immediate threat that the injury will recur. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Lyons*, 461 U.S. at 101-06, 111. At the preliminary injunction stage, Plaintiffs "must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted). Because Plaintiffs seek an injunction limiting future immigration enforcement operations, they needed to demonstrate a "real and immediate threat" that they would again be subjected to the challenged conduct. *Lyons*, 461 U.S. at 103.

The Supreme Court has consistently reiterated this principle. In *Lyons*, the plaintiff alleged that police officers had subjected him to an unconstitutional chokehold during a traffic stop. 461 U.S. at 97-98. Although the plaintiff alleged a completed constitutional violation, the Supreme Court held that he lacked standing to seek an injunction governing future police conduct because he could not show that the challenged conduct was likely to recur. *Id.* at 105-06. As the Supreme Court explained, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 95-96. Based on "[t]he speculative nature of Lyons

claims of future injury," the Supreme Court concluded that the "prerequisite of equitable relief ha[d] not been fulfilled." *Id.* at 111.

*Clapper v. Amnesty International USA* is also instructive. 568 U.S. 398 (2013). There, the Supreme Court addressed a federal law allowing the government to conduct surveillance of certain "individuals who are not 'United States persons'" and are "located outside the United States." *Id.* at 401 (citation and footnote omitted). In holding the plaintiffs lacked a "certainly impending" future injury, the Supreme Court recognized that a "*possible* future injury" and "nonparanoid fear" will not suffice for Article III standing. *Id.* at 409 (citation omitted), 416.

The Supreme Court's recent grant of a stay pending appeal of a materially similar injunction in this very case further confirms that understanding. In concurring in the grant of the stay, Justice Kavanaugh explained that Plaintiffs' theory "largely tracks the theory rejected in *Lyons*." *Perdomo*, 146 S.Ct. at 2 (Kavanaugh, J., concurring). Justice Kavanaugh also observed that Plaintiffs had "no good basis to believe that law enforcement will unlawfully stop them in the future" and "certainly no good basis for believing that any stop of the plaintiffs is imminent." *Id.* at 2-3.

Moreover, this Court recently considered the issue in *United Farmworkers of America v. Mullin*, No. 25-4047, 2026 U.S. App. LEXIS 25727, at *7 (9th Cir. Aug. 24, 2026). Decided in the same preliminary injunction posture as this case (except here, the Court had already received guidance from the Supreme Court in this litigation), this Court lifted a preliminary injunction and remanded because the lower court had considered the plaintiffs' allegations of past harm only, which "does not, on its own, establish standing to seek prospective relief." *Id.*

### B. The Individual Plaintiffs Failed To Demonstrate A Real And Immediate Threat Of Future Injury

Plaintiffs seek prospective relief governing future immigration enforcement operations. To obtain that relief, they were required to show they face a real and immediate threat of future unlawful injury. *Lyons*, 461 U.S. at 105-06, 111. Plaintiffs' theory rests on two propositions: that some past enforcement activity was allegedly unlawful and that immigration enforcement operations will continue. But even if both propositions are accepted, neither establishes what Article III requires: a certainly impending *future* stop without reasonable suspicion based exclusively on the two prohibited factors. As Justice Kavanaugh explained when the Supreme Court stayed the district court's earlier injunction, Plaintiffs have "no good basis to believe that law enforcement will unlawfully stop them in the future" and "certainly no good basis for believing that any stop of the plaintiffs is imminent." *Perdomo*, 146 S.Ct. at 2-3 (Kavanaugh, J., concurring). That much continues to be true.

**1.** The defects in standing are not cured simply because Plaintiffs returned with more evidence about the past. The expanded record ultimately presented more of the same type of evidence the Supreme Court had already considered. Yet Plaintiffs returned to the district court advancing the same standing theory, and the district court accepted it. Absent evidence that they are likely to be subjected again to the challenged conduct, Plaintiffs are "no more entitled to an injunction than any other citizen." *Perdomo*, 146 S.Ct. at 3 (quoting *Lyons*, 461 U.S. at 111).

Plaintiffs supplemented the record with additional declarations, anecdotes, and allegations concerning the purported policy. But the nature of the evidence never changed. The expanded record remained focused on past encounters and alleged past misconduct, not future injury.

For example, Plaintiffs Perdomo, Osorto, and Molina rely primarily on encounters that allegedly occurred on June 18, 2025. 4-ER-755. Plaintiff Hernandez Viramontes points to prior encounters with immigration officers on June 9, 14, and 18, 2025. 4-ER-789-90; 1-ER-87. And Plaintiff Gavidia invokes an encounter that allegedly occurred on June 12, 2025. 4-ER-791. None of Plaintiffs' "new" evidence demonstrates repeated stops or a non-speculative likelihood of a future, unlawful stop. At best, those encounters may show past injury. They do not establish that any named Plaintiff faces a certainly impending unlawful stop.[3]

Updated declarations cannot bridge that gap. In those declarations, Plaintiffs express fear that the same thing will happen again. But subjective fear is not the test. The standing inquiry turns on "the reality of the threat of repeated injury," not a plaintiff's "subjective apprehensions." *Lyons*, 461 U.S. at 107 n.8, *Clapper*, 568 U.S. at 416 (rejecting standing based on "nonparanoid fear"). Plaintiff Hernandez Viramontes stated that he feared agents would "stop and investigate [him] all over again." 3-ER-413-19. Plaintiff Gavidia stated that he was

---

[3] Although Plaintiffs initially argued that Plaintiff Molina's re-arrest was evidence of the likelihood of future injury, the government introduced evidence that the re-*arrest*—*i.e.,* not *stop*—was based on a warrant after determining that he violated his terms of release. *See* 3-ER-431-432. Plaintiffs now appear to have abandoned any argument Molina's re-arrest was unlawful.

"deeply concerned" federal agents would stop him again and feared that he would be racially profiled during future immigration enforcement activity. 3-ER-406-12. Plaintiff Perdomo stated that he "live[s] in fear of being stopped again for the same reasons." 3-ER-490-96. Plaintiff Molina stated: "I am worried that I will get arrested again for the same reasons as before." 3-ER-497-503. And Plaintiff Osorto stated: "I am afraid that I am likely to be arrested again for the same reason." 3-ER-504-11. None of the declarations provide a concrete reason to believe that any individual Plaintiff is likely to be stopped again, let alone without reasonable suspicion.

Several declarations also confirm the speculative nature of Plaintiffs' theory. For instance, Plaintiff Hernandez Viramontes continues to work at the same car wash where agents previously appeared. 3-ER-413-19. Plaintiff Gavidia still lives and works in Los Angeles County. 3-ER-406-12. And Plaintiffs Perdomo, Molina, and Osorto actively seek construction work in the Pasadena area. 3-ER-490-96; 3-ER-497-503; 3-ER-504-11. Thus, even though Plaintiffs continue to live, work, and seek employment in the same environments they claim expose them to immigration enforcement, they identify no facts showing that a future unlawful stop is likely rather than merely possible. Those circumstances may establish the possibility of future encounters with immigration officers, but they do not establish the real and immediate threat of future unlawful injury that Article III requires.

Nevertheless, the district court reached the opposite conclusion, holding that "the pattern of officially sanctioned behavior, together with the absence of a predicate act, establishes the requisite threat of future injury." 1-ER-107. That error was legal, not factual.

The district court treated an alleged policy as proof of future injury. But *Lyons* makes clear that those are distinct requirements. There, the plaintiff alleged not only that officers had unlawfully choked him in the past, but also that the City routinely authorized the use of chokeholds in constitutionally impermissible circumstances. The Supreme Court held that those allegations "fall[] far short" of establishing a case or controversy because they did not demonstrate why Lyons himself was realistically threatened with future injury. *Lyons*, 461 U.S. at 105-06.

The same principle controls here. Even assuming Plaintiffs could prove every allegation regarding the purported "Racially Based Stops Policy," they still were required to establish they faced a real and immediate threat of future injury. They have not met their burden of proof. A policy, even if real (which Plaintiffs fail to demonstrate and evidence in the record contradicts), does not establish that future harm is certainly impending. Indeed, the Supreme Court in *Lyons* accepted *arguendo* allegations that "police officers, 'pursuant to the authorization, instruction and encouragement of defendant City of Los Angeles, regularly and routinely appl[ied]'" the chokeholds that the plaintiff sued to enjoin. 461 U.S. at 98; *see id.* at 113-114 (Marshall, J., dissenting) (observing that "[t]he complaint clearly alleges that the officer who choked Lyons was carrying out an official policy"). Yet even the assumed existence of the policy did not control, as the Court still determined there was no standing. *See Hussen v. Noem*, 822 F.Supp.3d 944 (D. Minn. March 9, 2026) (finding no standing, explaining, "[t]hough Plaintiffs have shown that Defendants likely maintained unconstitutional policies, Plaintiffs have not shown that irreparable injury is likely to befall them in the

immediate future."). By treating an alleged policy as proof of future injury, the district court relieved Plaintiffs of the burden Article III imposes. That is precisely the standing theory rejected in *Lyons* and later identified by Justice Kavanaugh as the key defect in Plaintiffs' case.

**2.** The experiences of non-parties do not establish future injury to the named Plaintiffs. Unable to find evidence of imminent future injury in the experiences of the named Plaintiffs, the district court turned to individuals who are not parties to this case. 1-ER-109. The court relied on the fact that "multiple declarants have been detained twice." 1-ER-109. It specifically relied on allegations that two members of a non-party advocacy group had been stopped twice and that one U.S. citizen had experienced multiple enforcement encounters. 1-ER-110-11. In other words, Plaintiffs found two people, who are not plaintiffs, who were allegedly stopped twice in a District of 20 million people. But even accepting every allegation concerning these third-party declarants as true, they do not establish that the *named Plaintiffs* are likely to be stopped again. *See O'Shea v. Littleton*, 414 U.S. 488, 495-97 (1974); *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044-45 (9th Cir. 1999) (en banc).

**3.** The passage of time since Plaintiffs' stops only underscores the remoteness of any future injury and raises serious questions about mootness. More than a year has passed since the incidents involving the named Plaintiffs, and nine months have elapsed since Operation at Large demobilized. But the named Plaintiffs cannot point to any intervening injury. Even if this Court at one point believed that there was a likelihood of recurring future injury, that prospect cannot remain "certainly impending" indefinitely. At some point, the passage of time

without any recurrence defeats any claim of a real and immediate future injury. That point has long passed here.

### C. Plaintiffs Also Cannot Establish Traceability Or Redressability

The same failure to establish a certainly impending future injury also defeats traceability and redressability. Plaintiffs continue to trace their asserted harms to past encounters rather than any imminent future stop. But Article III requires a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. More than a year has passed since the June 2025 encounters, and Operation At Large Los Angeles has long since been demobilized. Plaintiffs therefore trace their asserted harms to past stops, not to any realistic threat of future unlawful injury. Without a non-speculative basis to believe that they themselves face a future unlawful stop, Plaintiffs cannot establish that any future injury is fairly traceable to the alleged policy or that the district court's sweeping injunction would redress such injury. *See United States v. Texas*, 599 U.S. 670, 674 (2023).

### D. Plaintiffs Cannot Avoid The Standing Defect By Changing Labels

**1.** Justice Kavanaugh helpfully identified the key standing defect in this case. *See Perdomo,* 146 S.Ct. at 2-3 (Kavanaugh, J., concurring). Plaintiffs responded by redefining the same alleged policy as a race-based enforcement policy, not by supplying evidence of future injury.

The district court's acceptance of that revised framing stands in stark tension with Supreme Court's decision in *Trump v. Boyle.* According to the district court, "the Supreme Court's reasons" for granting a stay "may well have involved the evidentiary record that

Plaintiffs had developed at the TRO stage—which . . . meaningfully differs now." 1-ER-99 n.35. But, as explained above, the expanded record only offers more of the same type of evidence that the Supreme Court deemed insufficient to sustain the earlier injunction. *See* pp. 19-20, *supra*. Although the district court acknowledged that the government now (as then) has *written* policies forbidding reliance on race alone to establish reasonable suspicion, it instead credited a cherry-picked smattering of individual arrests, isolated remarks by a handful of officers taken out of context, increased immigration enforcement generally, and the subjective impressions of declarants, many of whom are not parties to this case.

Nor was the district court right to justify its ruling by invoking a decision by a motions panel of this Court denying the very stay that the Supreme Court later granted. *E.g.*, 1-ER-94-95 n.32. Indeed, that turned vertical *stare decisis* upside down, elevating an intermediate court's holding over a directly contrary decision of the Supreme Court on an identical set of issues. And even if the Supreme Court's decision did not specify its precise reasoning for granting the stay of the TRO, the Supreme Court unquestionably and necessarily found—contrary to this Court's analysis—that the government was likely to succeed on the merits and had demonstrated irreparable harm. The district court cannot conclude that the issues are sufficiently identical to warrant reliance on this Court's stay decision, *see E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021), yet insufficiently similar to give force to the Supreme Court's later stay of that decision.

The district court's invocation of *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), is similarly flawed. *See* 1-ER-107-18; 1-ER-12-14. That case addressed an allegation that the

Maricopa County Sheriff's Office developed an unconstitutional policy of "stopping Latino drivers and passengers . . . without individualized suspicion" and "of racial profiling toward Latino persons." *Id.* at 994 (citation omitted). This Court held that the named plaintiffs—five individuals stopped by immigration officers—had standing to pursue prospective equitable relief on their claim that the government "may not detain a person based solely on suspicion about that person's unlawful immigration status." *Id.* at 995-99. Because the sheriff's office had a "*stated* policy and practice" of conducting the alleged stops, the Court concluded that the plaintiffs faced a "sufficiently likely" future injury. *Id.* at 998 (emphasis added).

*Melendres* bears scant resemblance to this case. The sheriff's office in *Melendres* did not dispute its "*stated* policy and practice" of "detain[ing] 'individuals based only on reasonable suspicion or probable cause that a person is not authorized to be in the United States.'" *Id.* at 998 (emphasis added) (citation omitted). Here, by contrast, the government has consistently denied the existence of the alleged unwritten policy, and there are publicly available policy memoranda which specifically refute the existence of such a policy. *See* 1-ER-95 n.33, 1-ER-107 n.37; https://www.cbp.gov/sites/default/files/documents/secretary-memo-racial-profiling-2013.pdf (last visited Nov. 24, 2026); https://www.cbp.gov/about/eeo-diversity/policies/nondiscrimination-law-enforcement-activities-and-all-other-administered (last visited Nov. 24, 2026). Nothing in *Melendres* displaces the bedrock requirement that a plaintiff must have a certainly impending injury to establish Article III standing for prospective injunctive relief. The mere existence of a policy does not mean that anyone and everyone can

challenge it. *Clapper,* 568 U.S. at 409; *Lyons,* 461 U.S. 95 at 105 (explaining that the alleged policy "does nothing to establish a real and immediate threat" of future injury).

**2.** Plaintiffs next attempt to manufacture standing from an asserted Fifth Amendment injury. But the requirements for Article III standing do not change based on the constitutional provision invoked.

The Supreme Court did not identify a Fourth Amendment-specific defect when it stayed the district court's earlier injunction. As Justice Kavanaugh explained, Plaintiffs had "no good basis to believe that law enforcement will unlawfully stop them in the future" and "certainly no good basis for believing that any stop of the plaintiffs is imminent." *Perdomo*, 146 S.Ct. at 2-3 (Kavanaugh, J., concurring). Standing fails regardless of whether Plaintiffs characterize the alleged policy as violating the Fourth Amendment, the Fifth Amendment, or both.

### E. The Organizational Plaintiffs And Intervenors Also Lack Standing

Associational standing fails for similar reasons. An organization seeking prospective relief on behalf of its members must identify at least one member who would have standing to seek that relief in his own right. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). As discussed above, no individual Plaintiff established standing to seek prospective relief and no association member has either. Nor did the organizations establish the interests it seeks to protect are germane to their purposes; nor did they establish that the relief requested did not require individual members' participation. Hunt, 432 U.S. at 343.

Just like the individual Plaintiffs, any risk of future harm for the organizations' members is speculative. *See Clapper*, 568 U.S. at 409. Nor can the organizations assert the Fourth Amendment rights of their members. "Fourth Amendment rights are personal rights which … may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165 (1969); *see Rakas v. Illinois*, 439 U.S. 128 (1978).

The same failure to establish a real and immediate threat of future injury also forecloses the joinder of Intervenors. The standing theories of the Intervenors are even more attenuated than Plaintiffs' and are directly foreclosed by Supreme Court precedent. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 390 (2024) (no standing based on downstream effects of regulatory action); *see also United States v. Texas*, 599 U.S. 670 (2023). Additionally, under long-settled doctrine, municipalities may not sue the United States in a *parens patriae* capacity because the citizenry is represented by the United States. *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923).

### F. The INA Independently Bars Plaintiffs' Claims

Plaintiffs also confront an additional jurisdictional obstacle. Section 1252(g) precludes judicial review of claims arising from decisions or actions to commence proceedings, adjudicate cases, or execute removal orders, and thus independently forecloses review of at least some claims challenging enforcement activities undertaken in furtherance of those functions. 8 U.S.C. § 1252(g). Conducting an investigative stop is a paradigmatic action to commence or execute removal proceedings.

## II. THE DISTRICT COURT ERRED IN CERTIFYING THE STOPS CLASSES

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's grant of the preliminary injunction. Because the class-certification issues are "inextricably intertwined" with the district court's preliminary injunction, this Court may also review the district court's grant of provisional and final class certification. *See Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018) (citation omitted); *Fraihat v. ICE*, 16 F.4th 613, 635 (9th Cir. 2021).

The district court erred in certifying Plaintiffs' proposed classes for two main reasons: the class members (1) lack standing and (2) fail to satisfy the requirements under Rule 23.

### A. The Class Members Lack Article III Standing

For the reasons previously explained, none of the proposed class representatives—whether individual or organizational—have Article III standing because there is no real and immediate threat of a future unlawful stop. That threshold defect independently forecloses class certification.

The proposed classes also indiscriminately sweep in individuals who lack Article III standing, as no particular putative members face no actual or imminent injury traceable to the alleged policy and redressable by judicial relief. *See O'Shea*, 414 U.S. at 494; *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). "Every class member must have Article III standing" because "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). But

Plaintiffs allege conduct that has been sanctioned by the Supreme Court—considering, for example, apparent race or ethnicity in the totality of the circumstances when evaluating whether reasonable suspicion of illegal presence, *Brignoni-Ponce*, 422 U.S. at 885. n.10—and speculative fears, neither of which supports standing for the class members. *See Lyons*, 461 U.S. at 111; *Clapper*, 568 U.S. at 409.

**B. The Classes Do Not Satisfy Rule 23(a)**

Plaintiffs' classes do not qualify for certification under Rule 23(a). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 275 (2014). Under Rule 23, a district court may certify a class only if (1) the class is "so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class"; (3) the representatives are typical of the class; and (4) the representatives will adequately protect the class's interest. Fed. R. Civ. P. 23(a). A district court must conduct "a rigorous analysis" to ensure "that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

**1.** The numerosity analysis "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330 (1980); *see* Fed. R. Civ. P. 23(a)(1). Between individual and organizational Plaintiffs' submissions (and after months of discovery), despite having thousands of members, they cannot identify even five individuals with the same factual pattern—status, location, and alleged stop—who would be entitled to the same uniform injunction. Plaintiffs contended to

the district court that "numerous unnamed future members ... are likely to be subjected to same unlawful practices," without producing any evidence of an official agency practice or policy to conduct unlawful stops. Such speculation cannot satisfy Rule 23(a)(1). *Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656, 661 (N.D. Cal. 1976). Courts require "some evidence of or reasonably estimate the number of class members with specificity." *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 680-81 (S.D. Cal. 1999).

**2.** Commonality requires Plaintiffs to demonstrate that "the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011). This does not mean that class members merely "suffered a violation of the same provision of law" or raise some common questions. *Id.* Class members suffer the same injury only if their claims turn on a common contention "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. Thus, "[w]hat matters to class certification [is] the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.*

The Fourth Amendment inquiry depends on a combination of factors, including those encompassed by the class definition. Thus, the requisite, fact-intensive Fourth Amendment analysis to identify potential class members defeats commonality. For example, in *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249 (9th Cir. 2024), this Court vacated a district court's class certification order for failing to adhere to Rule 23's "rigorous" commonality analysis,

emphasizing the plaintiffs' "fact-specific constitutional claims." *Id.* at 1254. There, the plaintiffs alleged local law enforcement used excessive force against protestors and restricted their First Amendment rights during demonstrations. *Id.* at 1259-61, 1265. In vacating the district court's order, this Court explained that the merits of the plaintiffs' claims depended on various, individualized factors, including "what force was used, what a particular class member was doing, what other protestors may have been doing, what the officers objectively observed, and a host of other factors." *Id.* at 1260. This Court concluded the plaintiffs had not "shown the existence of common evidence that can resolve in 'one stroke' the class members' claims that hinge on a wide array of facts and circumstances." *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).

So too here. Even if Plaintiffs had a qualifying injury, which they do not, they cannot demonstrate the existence of "common evidence" or overcome the diverging individual circumstances to demonstrate commonality. Absent such evidence, to identify individuals that arguably satisfy Plaintiffs' class definitions, each putative class member would essentially undergo a mini-trial and review of their record to assess the veracity of the officer's objective determination that they had reasonable suspicion of illegal presence to engage in an investigatory stop. This is contrary to this Court's requirement of "common evidence" that may resolve "the class members' claims" in "one stroke[,]" *Black Lives Matter* 113 F.4th at 1254 (quoting *Wal-Mart*, 564 U.S. at 350). As certified, the district court will oversee thousands of stops and arrests, needing to weigh the subjective facts of each to determine whether the totality of the circumstances (from the perspective of the officer) supported a finding of reasonable suspicion. This is precisely what the Federal Rules do not allow.

**3.** Typicality is absent if "there is a wide gap between" an individual's claim and "the existence of a class of persons who have suffered the same injury." *Falcon*, 457 U.S. at 157. Every stop is different, and most—perhaps all—class members were subject to lawful stops. For example, Plaintiffs Perdomo and Osorto both tried to *flee* upon approach by immigration officers. They therefore presented factors separate and distinct from their ethnicity or low-income status, making their individual circumstances *atypical* of the classes envisioned by the district court.

**4.** The district court erred in finding that Organizational Plaintiffs could serve as class representatives. The Organizations do not themselves possess the individualized interests, circumstances, and claims of the individuals they intend to represent. Even as a representative, Rule 23 requires that the named Plaintiffs be a member of the class, possess the same interest, and suffer the same injury as fellow class members. *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). Rule 23(a) requires that "one or more *members* of a class may sue" as representatives "on behalf of all [class] members[.]" The Organizational Plaintiffs are not "members of [the] class," thus they cannot represent that class. Fed. R. Civ. P. 23(a); *see Wal-Mart*, 564 U.S. at 348-49 (""[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.""). Nor are their claims "typical" of the class, as their interests as organizations are inherently different from each class member. Fed. R. Civ. P. 23(a)(3). In any event, they too lack standing and thus cannot create standing for or represent the classes.

### C. The Classes Fail Rule 23(b)

The district court likewise erred in concluding that the classes satisfied Rule 23(b)(2). Plaintiffs failed to show that the government has improperly acted on "grounds that apply generally to the class" and that relief is "appropriate respecting the class as a whole." As discussed above, Plaintiffs neither demonstrated that "relief is available to the class as a whole" nor that the challenged conduct, which Plaintiffs fail to tether to official policy or practice, "can be enjoined or declared unlawful" for all class members. *See Wal-Mart*, 564 U.S. at 360; *Parsons v. Ryan*, 754 F.3d 657, 687 (9th Cir. 2014). Every immigration stop presents unique facts and involves split-second decision-making by trained immigration officers based on a multitude of factors. Class treatment is fundamentally improper under those circumstances.

The proposed class definitions also create a classic fail-safe problem because class membership depends on whether Plaintiffs prevail on the merits. An individual becomes a class member only if Plaintiffs ultimately prove that the stop was unlawful and that the alleged policy exists. Courts have repeatedly rejected class definitions that make membership depend on success on the merits. *See, e.g.*, *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). Rather than providing an administrable means of identifying class members, the proposed definitions require merits determinations before membership can be determined.

Nor are the classes readily ascertainable. Rule 23 requires that a class be "definite" or "ascertainable." *J.D. v. Azar*, 925 F.3d 1291, 1319-20 (D.C. Cir. 2019); *Ballas v. Anthem Blue Cross Life & Health Ins. Co.*, 2013 WL 12119569, at *4 (C.D. Cal. Apr. 29, 2013). This

requirement ensures that the class is "neither amorphous, nor imprecise." *Lewis v. Nat'l Football League*, 146 F.R.D. 5, 8 (D.D.C. 1992) (quotation and citation omitted). For example, class certification sought under Rule 23(b)(2) (as sought here) must "accurately articulate[] the general demarcations of the class of individuals who are being harmed." *Thorpe v. District of Columbia*, 303 F.R.D. 120, 139 (D.D.C. 2014) (cleaned up). Here, given that class definition depends on the perception of amorphous factors—"apparent status as ... low income (or working class)" and "apparent status as ... Latino"—the classes cannot be readily ascertained or objectively defined.

## III. THE DISTRICT COURT MISAPPLIED THE FOURTH AMENDMENT AND EQUAL-PROTECTION PRINCIPLES

### A. The Injunction Conflicts With Fundamental Fourth Amendment Principles

Even if this Court finds standing (which it should not), the district court erred in concluding Plaintiffs were likely to succeed on the merits of their Fourth Amendment claim. DHS policy requires officers to develop reasonable suspicion before conducting investigative stops, and the district court misapplied the Fourth Amendment in granting the preliminary injunction.

The Fourth Amendment permits detentive stops based on reasonable suspicion. *Brignoni-Ponce*, 422 U.S. at 880. Reasonable suspicion encompasses "specific articulable facts, together with rational inferences from those facts," that a person is unlawfully present in the United States. *Id.* at 884. The inquiry "turn[s] on the totality of the particular circumstances." *Id.* at 885 n.10; *see United States v. Arvizu*, 534 U.S. 266, 273 (2002). By definition, no particular

circumstantial factor is categorically off-limits—whether that factor is a person's appearance, behavior, or the officer's past experience with the particular offense, location, or suspect. *See, e.g.*, 2-ER-172-73 (collecting examples of reasonable-suspicion factors in the immigration enforcement context). Nor may courts replace that individualized inquiry with rigid rules dictating the weight of specific factors.

Reasonable suspicion is context-dependent. Justice Kavanaugh has already listed several factors supporting reasonable suspicion for an immigration-related stop in the Los Angeles area:

> that there is an extremely high number and percentage of illegal immigrants in the Los Angeles area; that those individuals tend to gather in certain locations to seek daily work; that those individuals often work in certain kinds of jobs, such as day labor, landscaping, agriculture, and construction, that do not require paperwork and are therefore especially attractive to illegal immigrants; and that many of those illegally in the Los Angeles area come from Mexico or Central America and do not speak much English.

*Perdomo*, 146 S.Ct. at 3 (Kavanaugh, J., concurring).

**1.** To start, Plaintiffs did not demonstrate that the government maintains a policy or practice of making suspicionless investigative stops in the Central District. To be clear, federal agents do not stop individuals based on perceived Latino ethnicity alone. If they did, there would undoubtedly be far more stops in the Central District, *See Vasquez Perdomo v. Noem*, 148 F.4th 656, 665 (9th Cir. 2025) (reporting that approximately 47.3% of the District's residents identify as Hispanic or Latino), and it would make their task of apprehending illegal aliens far more difficult.

Despite expansive discovery, Plaintiffs were unable to present new evidence supporting their baseless assertions that immigration officers have rejected a totality-of-the-circumstances approach for one of racial profiling. 3-ER-320. Understanding that the previous injunction was resoundingly rejected by the Supreme Court, Plaintiffs tried to allege that immigration enforcement during Operation at Large was instead based only on race and class, painting the other factors as "pretext." 3-ER-317-18. If agents were enforcing immigration law based solely on race and class, they would be randomly stopping half of the Central District and wasting time with people who are lawfully present in the United States. Additionally, the record confirms that the majority of arrests made during the Operation at Large were of previously determined targets. *See* 3-ER-319 (deportation officer estimating that about 25-40% of arrests his team currently makes are of non-targets). That 60 to 75% of the arrests are of predetermined targets refutes any allegation that the targeting intelligence is merely a pretext for stopping anyone appearing working-class and Latino.

The district court's reliance on isolated incidents where select officers allegedly used slurs is also insufficient to establish a policy or practice of racially based stops. *See* 1-ER-77-78; 1-ER-94; 1-ER-101 (discussing the incidents and the court's reliance on them). DHS and its components explicitly prohibit the use of racially offensive language. *See* https://www.ice.gov/doclib/foia/policy/guidanceLanguageAccessCrossCulturalComms.pdf (last visited Nov. 24, 2026); WOLA Border Oversight, *available at* https://borderoversight.org/agency/border-patrol/ (last visited Nov. 24, 2026) (detailing public statements by CBP spokesperson that "[t]he use of any derogatory language towards

others is unacceptable and will not be tolerated . . . [and that] any alleged misconduct would be referred to CBP's Office of Professional Responsibility, from which criminal or administrative investigations could arise."); *see also* https://www.cbp.gov/sites/default/files/assets/documents/2021-Jan/cbp-standards-conduct-2020_0.pdf (last visited Nov. 24, 2026) ("Employees will not act or fail to act on an official matter in a manner which improperly takes into consideration an individual's race, color, age, sexual orientation, religion, sex, national origin, disability, union membership, or union activities"). The isolated use of offensive language by a few employees who are nonagency decisionmakers—a few instances in the hundreds/thousands of emails, messaging chats, and bodyworn cameras as well as several depositions exchanged during discovery—cannot support a conclusion of a policy or practice of racial profiling. *See Munyon v. Henson*, 2010 WL 480881, at *7 (C.D. Ill. Feb. 2, 2010) ("Defendant's conduct, however rude and unprofessional, does not rise to the level of a Fourth Amendment violation.") (collecting cases); *Barrera v. DHS*, No. 07-3879, 2009 WL 825787, at *7 (D. Minn. Mar. 27, 2009) ("Use of a racial slur, however, does not in itself constitute a violation of the Fourth Amendment."). And agents are trained on reasonable suspicion, including that race alone is insufficient. The district court acknowledged much of this yet still held there was an unwritten policy contrary to those written policies.

In finding an unwritten policy, Plaintiffs and the district court largely relied on of a handful of anecdotal experiences during an operation—which has since demobilized, 3-ER-427, Ex. A—that saw 3,220 illegal aliens detained, many of whom were violent criminals. That

is hardly evidence of a policy or practice to conduct stops without reasonable suspicion. But the district court combined national enforcement directives, testimony about factors contributing to reasonable suspicion, vague reference individual encounters, a vague statement from one deponent that his supervisor never raised any concerns to find an officially sanctioned practice of detaining people only because they appeared Latino and working-class status. 1-ER-64; 1-ER-81-95. Nothing in that supposed evidence though, permitted the district court to make the inference that immigration officers have replaced reasonable suspicion with a categorical demographic profile.

In support of its conclusion, the district court cited generalized statements calling for more arrests of illegal aliens. 1-ER-64. Those statements identify the object and intensity of enforcement; they do not instruct officers to dispense with reasonable suspicion or select individuals based on unlawful racial profiling. When a local police chief or politician publicly pronounces an intention to "clean up the streets" or "take a bite out of crime," no one assumes that they will do so in a constitutionally suspect manner. The district court made unwarranted and unsupported inferences based on the completely appropriate stated intention to increase immigration enforcement in the wake of a lengthy period during which that enforcement was sorely lacking.

The district court also misconstrued deposition testimony to attempt to substantiate the alleged unwritten policy. For example, the district court cited testimony by a Rule 30(b)(6) witness that referenced apparent ancestry as a "determining factor" of the alleged policy. 1-ER-91. Earlier in its opinion, however, the district court characterized the same witness's

testimony as recognizing that apparent ethnicity "*can* contribute to the basis for reasonable suspicion" alongside *other factors*. 1-ER-66 (emphasis added). Another Rule 30(b)(6) witness testified to the same effect. 1-ER-91.

The other evidence relied on by the district court is equally unpersuasive. For example, one agent described a resemblance to a target, but the district court noted that he identified no shared trait other than Latino appearance and that "his supervisor had never raised any concerns with him as to his conduct." 1-ER-92; *see* 1-ER-93 (similar). Those statements hardly establish that supervisors—let alone agency decisionmakers—authorized officers to conduct stops without reasonable suspicion. One vague statement taken out of context about one supervisor hardly establishes that all supervisors authorized officers to conduct stops without reasonable suspicion or based solely on race in direct contradiction of Agency policy.

Nor does the absence of questioning before a seizure necessarily establish the absence of information beforehand. The district court also catalogued declarations describing detentions without prior identifying questions. 1-ER-66-73. The Fourth Amendment inquiry concerns the facts available when the seizure began; it does not invariably require officers to acquire those facts through questioning of the person stopped. *Brignoni-Ponce*, 422 U.S. at 884-85. And the general proclivity of aliens to work certain jobs because they do not require proof of work authorizations is clearly a legitimate factor that can be considered (and one the district court tried to cut out from its previous finding of four factors).

**2.** The record further demonstrates that reasonable suspicion supported the challenged stops. To begin, many encounters were consensual, which do not amount to seizures under

the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980). Agents often approach and question individuals without physical restraint or coercion—typical examples include consensual questioning at job centers and marketplaces. 4-ER-725-29; 3-ER-558-66. Questioning by an immigration officer rises to the level of a seizure only when, "taking into account all of the circumstances surrounding the encounter, the [] conduct would have communicated to a reasonable person that [they were] not at liberty to ignore the police presence and go about [their] business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quotation marks and citation omitted). Where individuals were approached and questioned about their identity, no Fourth Amendment seizure occurred. *See Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177, 185 (2004) (explaining that law enforcement "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure").

Even if the encounters relied on by the district court were not consensual, they were supported by reasonable suspicion. Here, the question is what constitutes reasonable suspicion for illegal presence in the United States—a status shared by an estimated 10 percent of the population of the Central District of California, or about 2 million people within the District. In that context, the two factors enumerated in the district court's injunction are plainly relevant. To take one example, agents may know that a particular low-wage occupation (e.g., construction, agriculture, car washing) disproportionately attracts illegal immigrants because it does not require documentation or verification. 2-ER-173 (describing businesses in those industries that rely heavily on cash-paid day labor). That fact may support reasonable

suspicion, even if the occupation also qualifies as "low-income or working-class" under the district court's undefined standard. *See, e.g., Maldonado v. Holder*, 763 F.3d 155, 161 (2d Cir. 2014) (noting that day labor is "an occupation that is one of the limited options for workers without documents"). Likewise, apparent ethnicity can be a factor supporting reasonable suspicion in appropriate circumstances. *See Brignoni-Ponce*, 422 U.S. at 885-86.

All of this reflects common sense: the reasonable-suspicion threshold is low, and the number of people who are illegally present and subject to detention and removal under the immigration laws in the Central District is extraordinarily high and starts off at a 1-in-10 probability just among the general population. The district court wrongly dismissed sole reliance on the two factors as categorically insufficient to supply reasonable suspicion in any context because they "describe only a broad profile." 1-ER-98. Just because the two factors may not supply reasonable suspicion in *some* circumstances, however, does not mean they will *never* do so or are categorically irrelevant. Reasonable suspicion is context-dependent and cannot be reduced to per se rules. Indeed, the Supreme Court has repeatedly overturned decisions imposing such rules. *See Arvizu*, 534 U.S. at 272; *Sokolow*, 490 U.S. at 8; *United States v. Banks*, 540 U.S. 31, 34, 41-42 (2003).

Nor is there any basis to conclude that officers relied solely on the two factors in conducting the challenged stops. Previously the Plaintiffs and District Court said there were four factors. Now, with no meaningful new evidence, they attempt to collapse those four factors into two amorphous ones. But in doing so, even the district court acknowledged officers were targeting particular locations and jobs, such as car wash workers. That

demonstrates more than two factors were routinely used. Indeed, even the district court acknowledged evidence concerning flight but incorrectly reasoned that flight from immigration officers categorically "does not create reasonable suspicion." 1-ER-87-89. The Supreme Court begs to differ. *See*, *e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). And it is hardly surprising that officers often end up stopping people collateral to their intended targets at locations where suspected immigration violations occur and individuals flee. 3-ER-472 (Plaintiff admitting to "run[ning] away"). Plaintiffs instead offer only speculation that their apparent ethnicity prompted the stops. *E.g.*, 3-ER-495 (offering as evidence supporting putative racial basis for stop bare speculation that: "I think that I was arrested that day … because of how I look."). Subjective belief of the person stopped has no bearing on whether the officer relief solely on race and had reasonable suspicion. And roughly 8,000 arrests among about 10,000,000 Latinos flatly contradict any suggestion that officers stop individuals "just because they look Latino." 1-ER-49; *see* 9th Cir. Dkt. No. 5, Ex. A. Based on this record, immigrations officers develop reasonable suspicion by considering the totality of the circumstances. They assess, among other things, time-and-place indicators, job-site patterns, language ability, and flight—as well as, consistent with *Brignoni-Ponce*, apparent ethnicity as a corroborating factor. Nothing in that approach offends the Fourth Amendment.[4]

### C. There Is No Equal-Protection Violation

---

[4] Because Plaintiffs did not establish the existence of their alleged policy, there is no final agency action for a claim under the Administrative Procedure Act. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (judicial review under the APA "is only available for 'final agency action'").

For similar reasons, the district court erred in concluding that the government violated equal protection principles because "apparent Latino race and low-income status are improperly constituting the core of the reasonable suspicion analysis." 1-ER-102. As discussed above, apparent race or ethnicity did not provide the sole basis for the challenged stops. Rather, consistent with Supreme Court precedent, immigration officers properly considered the subjects' race and ethnicity as a factor in the analysis. *See Brignoni-Ponce*, 422 U.S. at 886-87 ("The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance *a relevant factor*, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens.").

Because immigration officers conducted stops in a "facially neutral" manner, rational basis review applies to Plainitffs' equal-protection claim. *Trump v. Hawaii*, 585 U.S. 667, 704-05 (2018). Nothing in the record suggests that officers selectively enforce immigration laws based on race—for example, by targeting illegally present Latino aliens but not similarly situated Russian aliens. *See Whren v. United States*, 517 U.S. 806, 813 (1996). But the Supreme Court has consistently recognized that, "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of," for example, "recipients of any cross-cutting immigration relief program." *Regents*, 591 U.S. at 34. If such disparate impacts sufficed to make out a claim, "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* Nor is economic status a suspect classification under the Fifth Amendment. *See, e.g.*, *San Antonio Independent*

*School Dist. v. Rodriguez*, 411 U.S. 1, 23-25 (1973). It further is not capable of meaningful delineation. For example, reasonable observers may come to *wildly* different estimates as to what percentage of the U.S. population is "low-income" or "working-class"—and who fits within those categories. Such abstract and absolute distinctions might work for academics, but they are incapable of consistent, objective application in the real world.

Even under the stricter standard set forth in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977), Plaintiffs cannot show that immigration officers were motivated by animus or discriminatory intent based on race and ethnicity in performing investigative stops in the Central District. The government's normal practice is to apprehend illegal aliens based on targeted information, not for invidious purposes. As explained above, DHS maintains explicit policies prohibiting its officers from stopping individuals on the sole basis of their ethnicity. A procedure that is conscious of classifications such as race, but facially neutral, does not implicate heightened scrutiny under equal protection. *See Mullin v. Doe*, 2026 WL 1825840, at *12-13 (2026) (denying interim relief on the plaintiffs' equal protection claim where there was a "strong, race-neutral explanation of these officials' statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies."). Following the reasoning in *Mullin*, the same could be said of the allegations here. Notably, Plaintiffs point to no official statement in which the government directed or suggested outright animus towards those of Latino ethnicity, confirming that Plaintiffs' equal-protection claim lacks merit.

The government's conduct would also pass muster under strict scrutiny. As previously discussed, immigration officers conduct investigative stops based on several salient factors. *See* 4-ER-613-14; 4-ER-730-34. The use of targeted, context-specific stops is sufficiently tailored to promote the compelling government interest of removing illegal aliens, especially those who commit felonies, from the United States.

The district court's strict-scrutiny analysis breaks down at several points. To start, it expressly depends on the existence of an alleged unwritten policy to conduct immigration stops without reasonable suspicion. The district court reasoned that, assuming Plaintiffs proved the "Racially Based Stops Policy," they would establish a racial classification unable to satisfy strict scrutiny. 1-ER-100. But calling the inferred practice a racial classification does not resolve the antecedent absence of evidence. The challenged encounters, testimony, and other record evidence unmistakably demonstrate that the government's official policy requires immigration officers to develop reasonable suspicion based on a totality of the circumstances. Any constitutional violation would therefore reflect an individual officer's departure from that official policy, not the existence of an unconstitutional policy.

## IV. THE REMAINING FACTORS DISFAVOR PRELIMINARY RELIEF

### A. Plaintiffs Do Not Face Irreparable Harm Without The Injunction

A plaintiff seeking a preliminary injunction must establish "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Thus, a "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (citation omitted). And "a

preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *see Winter*, 555 U.S. at 22 (emphasis added)).

Plaintiffs do not clear this high bar. Most obviously, Plaintiffs lack an injury sufficient for standing; by definition, then, no irreparable harm exists. There is similarly no evidence that any unlawful stop creates an "immediate threat that the plaintiff[s] will be wronged again," foreclosing prospective equitable relief. *See Lyons*, 461 U.S. at 111. The district court identified no further stop of any of the five named Plaintiffs after their June 2025 encounters. *See* 1-ER-108-10. Even if another future stop were reasonably likely, the injunction would fail to prevent such a stop as a general matter because it *permits* investigative stops that are based on more than the enumerated factors. Plaintiffs also remain protected by the Fourth Amendment and by DHS policy that is fully consistent with the Constitution and federal law. Although the district court should have examined the harm stemming from the alleged failure to conduct without reasonable suspicion, it emphasized the downstream effects of a stop—such as "continuing fear of another stop while seeking work." 1-ER-108. To the extent the district court considered prospective harms at all, it applied—at best—the impermissibly lenient "possibility" standard. *Winter*, 555 U.S. at 22 (citation omitted).

Plaintiffs' failure to identify a policy requiring or authorizing unlawful immigration stops further undermines any claim of irreparable harm. As the Supreme Court made clear in *Lyons*, a court cannot find irreparable harm based on a "claim by any or all citizens who no

more than assert that certain practices of law enforcement officers are unconstitutional." *Lyons*, 461 U.S. at 111. And DHS's policies have consistently required immigration officers to develop reasonable suspicion before conducting an immigration stop.

### B. The Balance Of Equities Tip Decisively In The Government's Favor

**1.** The injunction inflicts irreparable harm on the government and public, whose interests "merge" here. *Nken* v. *Holder*, 556 U.S. 418, 435 (2009). Most immediately, the district court's order irreparably harms the government by thwarting enforcement of immigration laws in a critically important region where some two million illegal aliens reside. "The problems posed . . . by illegal immigration," from "'crime'" and "'safety risks'" to the consumption of limited public resources, "must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 398 (2012) (citation omitted). Because illegal aliens "create significant economic and social problems" and are "themselves ... vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation," "the public interest demands effective measures to prevent the illegal entry of aliens." *Brignoni-Ponce*, 422 U.S. at 878-79. "To implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). Self-evidently, preventing the Executive Branch from implementing a major enforcement priority and effectuating the immigration laws Congress enacted constitutes irreparable harm. The universal injunction here also inflicts irreparable harm by supplanting the political branches' judgments and intruding on the separation of powers. *See CASA,* 606 U.S. at 859.

Further, the injunction here gravely chills enforcement efforts by improperly threatening federal officers with contempt and extensive judicial second-guessing even if they comply with its terms. *Cf. Harlow* v. *Fitzgerald*, 457 U.S. 800, 807 (1982) (noting the "public interest in encouraging the vigorous exercise of official authority." (citation omitted)). 2-ER-165; 2-ER-172. ICE officers and CBP agents are trained to identify specific, articulable facts supporting reasonable suspicion before detaining a person to investigate unlawful presence. 8 C.F.R. § 287.8(b)(2); 2-ER-165; 2-ER-172. In denying a stay, the district court explained the injunction does not require officers to determine a person's ethnicity or economic status before making a stop. 2-ER-135. Even with that clarification, an officer investigating a particular employer may hesitate to make an otherwise lawful stop for fear that a court will later treat the worker's connection to that employer as a proxy for economic status. 2-ER-168-69. That uncertainty can affect an investigation before any detention occurs. During targeted operations, ICE and CBP officers are trained to develop information through consensual questioning of others they encounter. ICE explained that uncertainty about which encounters the injunction covers makes officers less likely to initiate those conversations. 2-ER-165; 2-ER-168.

Delay during a volatile encounter poses a more immediate risk. CBP personnel in the District have faced violent crowds, assaults involving rocks and frozen bottles, and gunfire. 2-ER-175. CBP explained that agents in those circumstances must make decisions in seconds and that hesitation over how a court might later assess the grounds for a stop can increase the risk of escalation and injury to agents and bystanders. 2-ER-175-76. The district court

acknowledged the resources that compliance would require. 2-ER-135. A later ruling can clarify what the injunction permits, but it cannot restore a lost investigative opportunity or undo an injury.

**2.** On the other side of the ledger, Plaintiffs' asserted harms rehash their flawed theories of standing and the merits and rest on conjecture that they will again be stopped in violation of their Fourth Amendment rights. *See* Argument § I.B, *supra*. Likewise, "[t]he interests of individuals who are illegally in the country in avoiding" arrest "is ultimately an interest in evading the law," which "is not an especially weighty legal interest." *Perdomo*, 146 S.Ct. at 5 (Kavanaugh, J., concurring).

Nor do Plaintiffs need a sweeping injunction to protect them from speculative future stops. The Fourth Amendment already applies by its own terms to all law-enforcement actions, and remedies already exist for violations—including monetary damages for wrongful detentions, and the exclusionary rule for unlawful stops that result in prosecution or involve an egregious violation of an alien's rights. *See generally Muehler v. Mena*, 544 U.S. 93 (2005); *Sanchez v. Sessions*, 904 F.3d 643, 649 (9th Cir. 2018) (exclusionary rule available in removal proceedings "when the agency egregiously violates a petitioner's Fourth Amendment rights"). Those existing remedies suffice to protect both Plaintiffs' interests and the public interest. Isolated past interactions are no basis for a universal, forward-looking injunction.

## V. THE INJUNCTION EXCEEDS THE LIMITS OF EQUITABLE RELIEF

### A. The District Court Issued An Impermissible Follow-The-Law Injunction

The district court's award of sweeping district-wide relief amounted to an impermissible and overbroad follow-the-law injunction. Rule 65 requires an injunction to state its terms specifically and describe in reasonable detail the acts restrained. Fed. R. Civ. P. 65(d)(1)(B)-(C). Those requirements protect against uncertainty and contempt based on commands too vague to understand. *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Here the question is whether an officer can tell, before making a stop, which facts the order permits the officer to weigh independently.

The operative text contains two related commands. The first prohibits the alleged practice of racial stereotyping in place of a pre-stop, individualized assessment. The second requires consideration of the totality of the circumstances and bars reliance solely on apparent low-income or working-class status and Latino identity, including when an identified target shares those characteristics. 1-ER-129. As to the first requirement, the injunction is plainly an impermissible follow-the-law injunction. Requiring agents to make an individualized assessment of whether a person can be stopped is nothing more than a command to apply the totality-of-the-circumstances test to assess whether there is reasonable suspicion. This is effectively a command to comply with the law, and even the district court essentially acknowledged as much. 1-ER-118 ("In any event, the Government 'cannot reasonably assert that it is harmed in any legally cognizable sense' by being enjoined to comply with the law."); *id.* (explaining that the injunction does not seek to prevent investigative stops, but "merely

seek[s] to prevent the Government from doing so illegally . . . and ensure the Government is abiding by its statutory and regulatory responsibilities in its actions in this District").

As to the second requirement, the terminology used by the Court is impermissibly vague. Terms like "working-class," "low-income," and "Latino" are all imprecise, and can mean different things to different people. The district court explained that "working-class" includes people who appear to be low-income laborers and day laborers. 1-ER-50 n.11. But that description gives an officer little guidance when the same observation bears on both occupation and apparent economic status. After all, many billionaires and rich celebrities dress slovenly, while many aspiring people with low incomes consciously and effectively dress above their "working-class" status (in the district court's conception). It is hardly a stretch to observe that such rigid conceptions of class are precisely what this nation *rejected* in declaring its independence against the inflexible and stultifying aristocratic society that was Eighteenth Century Great Britain.

Indeed, as ICE explained, a person wearing stained jeans, work boots, and a high-visibility vest at a construction site may be the site manager. The clothing can help explain what the person is doing at the site while revealing little about the person's income. 2-ER-167. CBP likewise explained that the order identifies no observable characteristics that distinguish someone who appears "working-class" or "low-income" and that many facts agents routinely consider could fall within either category. That makes it difficult to train agents to determine which observations they may weigh independently when assessing reasonable suspicion. 2-ER-174.

The earlier panel read the prior TRO to give officers a clear answer about contempt. The Court determined that reliance on facts beyond the four listed factors took a stop outside the TRO's prohibition even if a court later found reasonable suspicion lacking. *Vasquez Perdomo*, 148 F.4th at 680. But that assurance only helps if an officer can identify what counts as an additional fact in the first place. The new injunction instead describes apparent economic status, a category that may encompass observations about clothing, work, and location. It gives no comparable guidance about observations that bear both on apparent occupation and on a person's connection to a particular worksite.

### B. The District Court Entered A Non-Party-Specific Injunction

If nothing else, the preliminary injunction flagrantly departs from the Supreme Court's holding in *Trump v. CASA*, which forbids the issuance of universal (i.e., non-party-specific) injunctions. In *CASA*, the Supreme Court addressed "universal injunctions," or injunctions that bar the defendant from enforcing "a law or policy against *anyone*," in contrast to injunctions limited to the plaintiff. 606 U.S. at 837. The Supreme Court found that the statutory grant of jurisdiction over suits "in equity" "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception." *Id.* at 841. And "[n]either a universal injunction nor any analogous form of relief was available . . . at the time of the founding." *Id.* at 842. Rather, "suits in equity were brought by and against individual parties." *Id.* "Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Id.* at 847. At most, a court granting equitable relief "may administer complete relief *between the parties*."

*Id.* at 851. "Under this principle, the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id.* at 852. And even then, "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id.* at 854.

Against that backdrop, the district court did not merely enjoin the government from stopping Plaintiffs without reasonable suspicion; it enjoined the government from conducting such stops of any of the 20 million people within the Nation's most populous federal judicial district. That extreme mismatch between Plaintiffs' asserted injuries and the district court's universal relief flouts *CASA*.

Nor could the district court justify that sweeping relief and circumvent *CASA* by certifying Plaintiffs' proposed classes. The First Discriminatory Treatment Class includes persons stopped at least in part because of apparent Latino identity, subject to the stated exceptions. The Suspicionless Stops Class includes persons subjected to an immigration stop based on their apparent status as both low-income or working-class and Latino. 1-ER-45. That certification was flawed because the class members lack Article III standing and the classes fail to satisfy Rule 23. More fundamentally, the injunction sweeps well beyond those two classes, "'improper[ly] intru[ding]' on 'a coordinate branch of the Government' and prevent[ing] the Government from enforcing its policies against nonparties." *CASA*, 606 U.S. at 859 (citation omitted).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's orders granting a preliminary injunction and class certification.

Respectfully submitted,

JONATHAN D. GUYNN
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney General*

AUGUST FLENTJE
*Deputy Director*
*Office of Immigration Litigation*

NANCY SAFAVI
JACOB BASHYROV
STEPHANIE L. GROFF
JASON K. ZUBATA
JENNIFER ROSARIO
AMOS NAM
*Trial Attorneys*

/s/ Jonathan Robbins
JONATHAN ROBBINS
*Assistant Director*
*Office of Immigration Litigation*
*U.S. Department of Justice*
*Civil Division*
*P.O. Box 878*
*Ben Franklin Station*
*Washington, D.C. 20044*
*jonathan.a.robbins@usdoj.gov*

Dated: November 24, 2026

*Attorneys for Defendants-Appellants*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**
**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

9th Cir. Case Number(s) 26-7277

The undersigned attorney or self-represented party states the following:

[ ] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ X ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*Vasquez Perdomo v. Scott*, No. 26-6891, arises from the same district court action and challenges the preliminary injunction and class-certification order concerning warrantless immigration arrests.

*Vasquez Perdomo v. Noem*, No. 26-209, arises from the same district court action and challenges the preliminary injunction governing access to counsel at the B-18 detention facility.

*United Farm Workers of America v. Mullin*, No. 25-4047, raises the closely related question whether plaintiffs have Article III standing to seek prospective injunctive relief against allegedly unlawful immigration stops.

/s/ Jonathan Robbins
JONATHAN ROBBINS
Assistant Director
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station Washington, D.C. 20044
jonathan.a.robbins@usdoj.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010, Garamond, 14-point type.

/s/ Jonathan Robbins
JONATHAN ROBBINS
Assistant Director
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station Washington, D.C. 20044
jonathan.a.robbins@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/Dkt system on November 24, 2026. I certify that all participants in the case are registered CM/Dkt users and that service will be accomplished by the appellate CM/Dkt system.

/s/ Jonathan Robbins
JONATHAN ROBBINS
Assistant Director
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station Washington, D.C. 20044
jonathan.a.robbins@usdoj.gov

# ADDENDUM

# ADDENDUM OF AUTHORITIES
# TABLE OF CONTENTS

8 U.S.C. § 1252(g) .......... 1a

8 U.S.C. § 1357 .......... 2a

8 C.F.R. § 287.8 .......... 4a

**8 U.S.C. § 1252**
**Judicial review of orders of removal**

. . .

**(g) Exclusive jurisdiction**

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

## 8 U.S.C. § 1357
## Powers of immigration officers and employees

### (a) Powers without warrant

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

**(1)** to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

**(2)** to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

**(3)** within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States;

**(4)** to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States; and

**(5)** to make arrests—

**(A)** for any offense against the United States, if the offense is committed in the officer's or employee's presence, or

**(B)** for any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony,

if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

Under regulations prescribed by the Attorney General, an officer or employee of the Service may carry a firearm and may execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States. The authority to make arrests under paragraph (5)(B) shall only be effective on and after the date on which the Attorney General publishes final regulations which (i) prescribe the categories of officers and employees of the Service who may use force (including deadly force) and the circumstances under which such force may be used, (ii) establish standards with respect to enforcement activities of the Service, (iii) require that any officer or employee of the Service is not authorized to make arrests under paragraph (5)(B) unless the officer or employee has received certification as having completed a training program which covers such arrests and standards described in clause (ii), and (iv) establish an expedited, internal review process for violations of such standards, which process is consistent with standard agency procedure regarding confidentiality of matters related to internal investigations.

**8 C.F.R. § 287.8**
**Standards for enforcement activities**

. . .

(b) Interrogation and detention not amounting to arrest.

(1) Interrogation is questioning designed to elicit specific information. An immigration officer, like any other person, has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away.

(2) If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.

(3) Information obtained from this questioning may provide the basis for a subsequent arrest, which must be effected only by a designated immigration officer, as listed in 8 CFR 287.5(c). The conduct of arrests is specified in paragraph (c) of this section.

(c) Conduct of arrests—

(1) Authority. Only designated immigration officers are authorized to make an arrest. The list of designated immigration officers may vary depending on the type of arrest as listed in § 287.5(c)(1) through (c)(5).

(2) General procedures.

(i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States.

(ii) A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.

(iii) At the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so:

(A) Identify himself or herself as an immigration officer who is authorized to execute an arrest; and

(B) State that the person is under arrest and the reason for the arrest.

(iv) With respect to an alien arrested and administratively charged with being in the United States in violation of law, the arresting officer shall adhere to the procedures set forth in 8 CFR 287.3 if the arrest is made without a warrant.

(v) With respect to a person arrested and charged with a criminal violation of the laws of the United States, the arresting officer shall advise the person of the appropriate rights as required by law at the time of the arrest, or as soon thereafter as practicable. It is the duty of the immigration officer to assure that the warnings are given in a language the subject understands, and that the subject acknowledges that the warnings are understood. The fact that a person has been advised of his or her rights shall be documented on appropriate Department forms and made a part of the arrest record.

(vi) Every person arrested and charged with a criminal violation of the laws of the United States shall be brought without unnecessary delay before a United States magistrate judge, a United States district judge or, if necessary, a judicial officer empowered in accordance with 18 U.S.C. 3041 to commit persons charged with such crimes. Accordingly, the immigration officer shall contact an Assistant United States Attorney to arrange for an initial appearance.

(vii) The use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or to make a statement is prohibited.

. . .